STATE OF NEBRASKA, APPELLEE, v. DEARLE
ALEXANDER, JR., APPELLANT.
339 N.W.2d 297

Filed October 21, 1983. No. 82-826.

Dennis R. Keefe, Lancaster County Public Defender, and Scott P. Helvie, for appellant.

Paul L. Douglas, Attorney General, and John Boehm, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, CAPORALE, and SHANAHAN, JJ., and GRANT, D.J.

SHANAHAN, J.

Dearle Alexander, Jr., was charged with three felonies—first degree murder, robbery by violence, and terroristic threats. Alexander's motion that the District Court waive jurisdiction of the criminal proceedings and transfer the case to the juvenile court was denied. Pursuant to a plea bargain, Alexander entered a plea of guilty to an amended information charging Alexander with manslaughter and robbery by violence. Alexander appeals from the District Court's retention of the proceedings as a criminal case and from the sentences imposed. We affirm.

Born on November 8, 1966, Dearle Alexander, Jr., had his first contact with a court in May 1980 when a petition was filed in the county court of Richardson County, Nebraska, as a juvenile court, concerning Alexander's shoplifting. After an adjudication involving that offense, the court placed Alexander on 6 months' probation.

Alexander's family later moved from Falls City, Nebraska (Richardson County), to Lincoln, Nebraska. A petition was filed in the juvenile court of Lancaster County in August 1980 due to Alexander's unauthorized absences from his parents' home. Alexander was placed on probation. In September 1980 Alexander was again placed on probation by the juvenile court and ordered to seek psychological

evaluation and counseling, after Alexander had assaulted his mother. Alexander was examined and evaluated by Dr. Burton Zung at the Lancaster County Child Guidance Center in September 1980. Dr. Zung's evaluation concluded that Alexander "presents no immediate danger to himself or to other persons."

As a result of Alexander's stealing property from a woman's apartment in November 1980, the juvenile court adjudicated Alexander to be a juvenile who had violated state law, and again placed Alexander on probation—this time in January 1981.

In March 1981 Alexander, a seventh grader, was expelled from junior high school because he was truant and had intimidated or harassed his fellow students.

On or about March 1, 1981, Alexander accosted a 9-year-old girl in a Lincoln public park. Alexander's brother had been defacing property in the park, and the girl objected to such conduct. At this encounter Alexander produced a switchblade knife and pressed the blade against the girl's chest, while saying, "I'm going to kill you." The girl, frightened but uninjured, escaped to her grandfather's house. This incident was later reported to the Lincoln police.

At 9:25 a.m. on March 3, 1981, Dorothy Blessing, age 65, was walking to work at the Lancaster Child Care Center. As the lady walked along a public street, Alexander approached from behind and struck Mrs. Blessing with a club 3 feet long and 2 inches in diameter. Mrs. Blessing fell unconscious on the sidewalk, and upon regaining her senses Mrs. Blessing found her purse missing. She was taken to Lincoln General Hospital and treated for lacerations.

On March 12, 1981, at approximately 9:30 p.m., Eugene Warren, age 80, was walking on a public sidewalk in Lincoln. Alexander, riding a bicycle, nearly collided with Warren. An altercation occurred, and after an exchange of words Alexander

left the scene, located a pile of junk in a nearby yard, and picked up a metal pipe approximately 2 feet long, 3 inches around, and weighing 10 pounds. Ten minutes later Alexander found Warren still walking on the sidewalk. Approaching Warren from behind, Alexander struck Warren in the head with the pipe. The first blow dazed Warren, and approximately 30 seconds later Alexander, gripping the pipe with both hands, struck Warren again. After Warren had collapsed on the sidewalk, Alexander "just turned around and walked off."

Warren was discovered lying on the roadway and taken for emergency care at Lincoln General Hospital around 10 p.m. Extensive efforts to revive Warren failed, and he died at 4:45 a.m. on March 13, 1981. The cause of death was "extensive skull fracture . . . shock and hemorrhage resulting from the cerebral contusion and laceration . . . multiple fractures . . . severe head trauma including a depressed skull fracture." The pathologist concluded that there were at least four blows to Warren's head.

Alexander was apprehended and placed in the Jennie B. Harrel Attention Center for Youth, pending proceedings. While in such confinement, Alexander suggested to two other inmates that they carry out a violent plan for escape from detention.

The county attorney of Lancaster County, Nebraska, filed an information charging Alexander with first degree murder regarding the death of Warren, robbery by violence regarding Blessing, and terroristic threats concerning the girl. At his arraignment, and pursuant to Neb. Rev. Stat. § 29-1816 (Reissue 1979), Alexander requested the District Court to waive jurisdiction over the matter as a criminal case and to transfer proceedings to the juvenile court.

At an evidentiary hearing on Alexander's motion for waiver and transfer to the juvenile court, William Janike, chief juvenile probation officer for Lancaster County, Nebraska, and Jeff Clausen, parole

officer of the Juvenile Parole Administration of the Department of Corrections of the State of Nebraska, described Alexander's possible confinement in the Youth Development Center in Kearney, Nebraska. At Kearney the average duration of confinement is 8 months, and there are no guards to "watch over" those confined. (Neb. Rev. Stat. § 83-472 (Reissue 1981) provides that anyone committed to the Youth Development Center-Kearney shall remain until 19 years of age unless sooner paroled or legally discharged, and further provides: "The assistant director of the Division of Juvenile Services shall adopt bylaws for the promotion, paroling and final discharge of inmates such as shall be considered mutually beneficial for the institution and the inmates. The discharge of any boy pursuant to the bylaws, or upon his arrival at the age of nineteen, shall be a complete release from all penalties incurred by conviction of the offense for which he was committed.")

Dr. Burton Zung, the clinical psychologist who had previously examined and evaluated Alexander in September 1980, testified that Alexander had "significant areas of immaturity," "average intellect," and intellectual functioning within average range. In a May 1981 evaluation, Zung diagnosed Alexander's condition as "conduct disorder, socialized aggressive." Zung further testified that Alexander had a "sustained pattern of rule breaking which included aggressive behavior . . . an ongoing way of life," and that use of violence in a robbery was "more characteristic of the crime committing adult than a child." Zung had "no detailed knowledge" of the crimes charged against Alexander.

Dr. Nora Quiason, a psychiatrist, evaluated Alexander in March 1981. Based upon Alexander's repeated violations of rules, rebellious attitude, poor impulse control, and aggressive behavior, Dr. Quiason diagnosed Alexander's condition as "conduct disorder, socialized aggressive." Dr. Quiason

described Alexander as "impulsive," that is, he tends to act before he thinks of consequences, and "has a very short fuse." Dr. Quiason further testified that Alexander had average intelligence and suffered no psychosis. When asked about the likelihood that treatment would be successful for Alexander, Dr. Quiason responded, "I don't know, I hope so." The prognosis of Dr. Quiason was that, "without intervention," there is a likelihood of repeated violence by Alexander. In forming her diagnosis, Dr. Quiason did not consider the circumstances surrounding the criminal charges against Alexander.

James K. Cole, a clinical psychologist, diagnosed Alexander's condition as "conduct disorder, socialized aggressive." "Conduct disorder" means there is a "high probability of acting aggressively." Cole testified that Alexander was preoccupied with physical violence and strongly values aggressive behavior as a way of handling other people. When Alexander is angered, there is a "high probability, relative to other people, that he will act on the basis of that anger and he will act in an aggressive way." Alexander's condition was not permanent, and Cole recommended treatment in a "highly controlled and structured environment," and acknowledged that any therapeutic efforts or treatments for Alexander would have to be "long term," that is, for a "number of years, quite a few years in this particular case." For an evaluation of Alexander, Cole admitted that elements or details of crimes or any other "moments of physical aggression" could be relevant and that evidence of premeditation could affect any evaluation. Cole did not have such information for his evaluation of Alexander, and acknowledged he was aware that previous counseling in the psychological treatment of Alexander "did not take."

At the conclusion of evidentiary hearings on May 23 and June 2, 1981, and as required by § 29-1816 regarding waiver of jurisdiction and transfer to the

juvenile court, the district judge considered the criteria set forth in Neb. Rev. Stat. § 43-202.01 (Reissue 1978). On June 16, 1981, the trial court found as follows: (1) Alexander "would most likely be amenable to an extended period of confinement and care in an institution where he will be closely supervised, and where he will receive treatment . . ."; (2) the offenses (alleged in the information) included "violence . . . committed in an aggressive manner and with premeditation"; (3) one of the offenses was committed for financial gain, while the other two offenses were attributable to the violent and aggressive tendencies of Alexander; (4) Alexander will be 15 years old in November 1981; the decedent, Warren, was 80 years old; the robbery victim, Blessing, was 65 years old; and the girl threatened was 9 years old; (5) there were previous adjudications in juvenile courts, including theft in May 1980; being a wayward and uncontrolled child, August 1980; assaulting his mother, August 1980; and Alexander has a "history of antisocial behavior with a pattern of physical violence"; (6) Alexander is somewhat immature, although he sees himself as sophisticated; is aggressive, impulsive, and easy to anger, with almost no insight or foresight; and has had considerable contact with law enforcement officials in Falls City and Lincoln; (7) the Youth Development Center at Kearney is the only facility available to the separate juvenile court for confinement of Alexander, but he could not be confined in that institution beyond his 19th birthday and could be administratively released at any time before age 19; (8) "it is in the best interests of [Alexander] and the public if [Alexander] continues in custody for a period extending beyond his minority"; and (9) there was evidence that persons such as Alexander are usually assigned to the Lincoln Correctional Center by the Department of Correctional Services, where there are programs that could be helpful to Alexander. The District Court concluded that there was a "sound basis"

for retaining jurisdiction of the criminal proceedings against Alexander, and declined to waive jurisdiction with a transfer of the proceedings to the juvenile court.

On August 26, 1982, pursuant to a plea bargain and an amended information, the charge against Alexander regarding the Warren homicide was reduced to manslaughter and the charge of terroristic threats to the little girl was dismissed. Alexander entered his plea of guilty to the charges in the amended information. In accordance with Neb. Rev. Stat. § 83-1,105(3) (Reissue 1981), the District Court committed Alexander to the Diagnostic and Evaluation Center of the Department of Correctional Services for an evaluation. The report from the Diagnostic and Evaluation Center contained the following: "For his age, [Alexander] shows strongly developing antisocial traits . . . . Our conclusions are consistent with the adolescent diagnosis of conduct disorder, socialized aggressive type. Significant outstanding traits are a history of vicious assaultiveness, lack of empathy for others, [and Alexander] when anger is provoked . . . can become hostile, vicious and homicidal. [Alexander] is also in need of confinement until he reaches enough maturity to control his impulsive, assaultive behavior. Typically, this does not occur until well in adulthood."

While confined in the Attention Center and awaiting sentence, Alexander, on January 16, 1982, assaulted an employee of the Attention Center because the employee attempted to change the TV channel while Alexander was watching a program. Alexander was convicted of assault and was sentenced to 60 days in jail.

After a presentence investigation and report, on November 17, 1982, the court imposed the following sentence on Alexander: For manslaughter, 6 years and 8 months to 20 years, and for robbery, 10 to 15 years, which sentences run consecutively.

In deciding whether to grant the requested waiver and to transfer the proceedings to juvenile court, the court having jurisdiction over a pending criminal prosecution must carefully consider the juvenile's request in the light of the criteria or factors set forth in § 43-202.01. There is no arithmetical computation or formula required in a court's consideration of the statutory criteria or factors. For retention of the proceedings as a prosecution of a criminal offense, the court need not resolve every factor against the juvenile. Also, there are no weighted factors, that is, no prescribed method by which more or less weight is assigned to each factor specified in the statute. *In Re Rodney Dean Stevenson*, 167 Mont. 220, 538 P.2d 5 (1975); *J. T. P. v. State*, 544 P.2d 1270 (Okla. Crim. 1975); *P. H. v. State*, 504 P.2d 837 (Alaska 1972).

The statutory criteria or factors of § 43-202.01 disclose a balancing test by which public protection and societal security are weighed against practical and not problematical rehabilitation of the juvenile. See, *Matter of Seven Minors*, ____ Nev. ____, 664 P.2d 947 (1983); *R____ M____ v. State*, 563 S.W.2d 853 (Tex. Civ. App. 1978); *State in the Interest of C. A. H. & B. A. R.*, 89 N.J. 326, 446 A.2d 93 (1982). "Rehabilitation has traditionally played a key role in the treatment of young offenders. . . . Nevertheless, the concept of deterrence and the need to balance individual justice with the needs of society—a balancing process that is basic and fundamental to the general scheme of the criminal law—also have a place in the juvenile justice system." *State in the Interest of C. A. H. & B. A. R.*, *supra* at 336, 446 A.2d at 98. As a result of such balancing, some youths will be held accountable through proceedings in the adult criminal justice system for effective deterrence of future antisocial misconduct.

Those testifying about Alexander's amenability to rehabilitation apparently gave little diagnostic weight to Alexander's assault upon his mother some

6 months before he killed Warren, his repeated contacts with authorities, expulsion from school due to intimidation of his fellow students, and several other incidents of Alexander's antisocial conduct. An evaluation by one who is oblivious of Alexander's history or disregards his past does result in some skepticism that Alexander is amenable to any rehabilitation. Alexander has displayed a propensity to brutalize those who are unable or unlikely to defend themselves. From vandalism to violence and from hooky to homicide, Alexander has demonstrated a definite pattern of malevolence and violence. A common denominator in any rehabilitation proposed for Alexander is a protracted program which will extend into adulthood and necessarily beyond the purview of the juvenile justice system. The probability of success and the duration of rehabilitative treatment must be considered in determining the manner and location of detention, that is, in the juvenile justice system or criminal justice system. See, *Jimmy H. v. Superior Court*, 3 Cal. 3d 709, 478 P.2d 32, 91 Cal. Rptr. 600 (1970); *In re Pima County, Juvenile Action No. J-218-1*, 22 Ariz. App. 327, 527 P.2d 104 (1974).

The findings recited by the trial court as a "sound basis" for retaining Alexander's case as a criminal prosecution for the felonies charged are supported by appropriate evidence. Applying the balancing test in the light of the several criteria or factors found in § 43-202.01, the trial court was correct in its judgment to retain Alexander's case for disposition in the general, criminal jurisdiction of the District Court.

In reviewing the sentences imposed by the trial court, we are acutely aware of Alexander's age. Age is a consideration in the imposition of any sentence, but not a controlling factor in determination of the punishment. We are obliged to consider protection for the public and deterrence—to Alexander and to those similarly inclined. As expressed in

*State v. Davis*, 199 Neb. 424, 427, 259 N.W.2d 33, 34 (1977): "Defendant's behavior reveals that he has become a serious threat to society and must be treated accordingly, regardless of age." See, also, *State v. Trusdale*, 199 Neb. 427, 259 N.W.2d 35 (1977); *State v. Selman*, 204 Neb. 833, 285 N.W.2d 832 (1979). The sentences were within the statutory limits as punishment for the crimes of which Alexander has been convicted. Under the circumstances of this case there is no abuse of discretion by the District Court regarding the sentences imposed. Therefore, the judgment regarding the sentences imposed must be affirmed. See, *State v. Sims*, 213 Neb. 708, 331 N.W.2d 255 (1983); *State v. Schmidt*, 213 Neb. 126, 327 N.W.2d 624 (1982).

Alexander's case involves a tragedy in every sense of the word—a youth, with his whole life ahead of him, snuffing out the remaining life of an elderly gentleman. The report from the Diagnostic and Evaluation Center of the Department of Corrections. indicates that, depending on Alexander's attitude, there is rehabilitative treatment available to Alexander in facilities within the State's criminal justice system.

The judgments of the District Court are affirmed.

AFFIRMED.