STATE OF NEBRASKA, APPELLEE, V. JUAN TREVINO, APPELLANT.
432 N.W.2d 503

Filed December 2, 1988.    No. 87-410.

Gregory J. Beal, of Gregory J. Beal & Associates, P.C., for appellant.

Robert M. Spire, Attorney General, and Lynne R. Fritz for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

This appeal arises from the consolidated trials of two cases before a jury. In the first case, defendant-appellant, Juan Trevino, was adjudged guilty of the second degree murder of Marco Perez, the use of a firearm to commit that felony against Perez, the attempted second degree murder of Mark Heil, and the use of a firearm to commit that felony against Heil. In the second case, Trevino was adjudged guilty of a first degree assault upon Heil and of using a firearm in the commission of that felony. Trevino was thereafter sentenced to imprisonment on each of these convictions, as detailed in part V of the ANALYSIS portion of this opinion. He assigns 12 errors, which may be summarized as claiming that the district court erred in (1) not waiving jurisdiction of Trevino, who was not quite 18 years old at the time of the crimes, to the juvenile court, (2) finding the evidence sufficient to support the verdicts, (3) admitting certain evidence, (4) excluding certain evidence, and (5) imposing excessive sentences. We affirm.

## ANALYSIS

Because of the breadth of this appeal, which embraces events from the pretrial refusal to waive jurisdiction in favor of the juvenile court to the imposition of sentences after conviction,

we shall, rather than first setting forth the many facts of record, deal with them as we consider, in turn, each summarized assignment of error.

## I. Jurisdiction

Trevino first asserts that the district court erred in not waiving jurisdiction over him to the juvenile court. Neb. Rev. Stat. § 29-1816 (Reissue 1985) provides, in relevant part, that upon proper motion, the district court shall consider whether it should waive jurisdiction of one who was less than 18 years of age at the time the alleged crimes were committed to the juvenile court for proceedings under the Nebraska Juvenile Code. Section 29-1816 further provides that after considering the criteria set forth in Neb. Rev. Stat. § 43-202.01 (Reissue 1978), now Neb. Rev. Stat. § 43-276 (Reissue 1984), the case shall be transferred unless "a sound basis exists for retaining the case." Section 43-202.01 lists the following matters to be considered by a county attorney in determining whether to file a criminal charge or juvenile court petition:

(1) The type of treatment such minor would most likely be amenable to; (2) whether there is evidence that the alleged offense included violence or was committed in an aggressive and premeditated manner; (3) the motivation for the commission of the offense; (4) the age of the minor and the ages and circumstances of any others involved in the offense; (5) the previous history of the minor, including whether he had been convicted of any previous offenses or adjudicated in juvenile court and, if so, whether such offenses were crimes against the person or relating to property, and other previous history of antisocial behavior, if any, including any patterns of physical violence; (6) the sophistication and maturity of the child as determined by consideration of his home, school activities, emotional attitude and desire to be treated as an adult, pattern of living, and whether he has had previous contact with law enforcement agencies and courts and the nature thereof; (7) whether there are facilities particularly available to the juvenile court for treatment and rehabilitation of the minor; (8) whether the best interest of the minor and the security of the public

may require that the minor continue in custody or under supervision for a period extending beyond his minority and, if so, the available alternatives best suited to this purpose; and (9) such other matters as he deems relevant to his decision.

We have previously determined that whether to waive jurisdiction over a criminal proceeding to the juvenile court is a matter within the discretion of the district court and that such decision will not be reversed on appeal absent an abuse of that discretion. *State v. Ryan*, 226 Neb. 59, 409 N.W.2d 579 (1987); *State v. Stewart*, 197 Neb. 497, 250 N.W.2d 849 (1977), *overruled on other grounds State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986).

Trevino's wife, then age 20, testified that Trevino was a high school student at the time of the crimes. Her testimony also indicates, however, that the couple then had at least one child who resided with them, that the young family had traveled to Nebraska so that Trevino could secure employment to provide for his family, that the family was then dependent upon Trevino for support, and that Trevino participated as a partner with his wife in raising their child. Reviewing the considerations set forth in § 43-202.01, the district court found that

the alleged offense included violence, and is alleged to have been committed in an aggressive and premeditated manner. . . . [T]hat the motivation for the commission of the offense is not clear, but it is alleged to have evil intent. . . . [T]hat the age of the juvenile is almost eighteen, and that the others involved in this matter are older people. . . . [T]here's nothing before the court as to previous record at this time. But I consider that slight consideration at this time. . . . [T]hat the juvenile is a married man, and has some sophistication and maturity as indicated by his coming to Nebraska to work, and he has been treated as an adult. . . . [W]ith this type of crime the facilities available to the juvenile court are not particularly important to me. . . . [T]he best interests of the juvenile, and particularly security of the public requires that he be continued in custody under supervision for a period extending beyond his minority. And that the available alternative, the best

alternative is that the defendant be prosecuted as an adult.

Sections 29-1816 and 43-202.01 provide a balancing test in which public protection and security are weighed against practical, and not problematical, rehabilitation in determining whether there should be a waiver of jurisdiction over a criminal proceeding to the juvenile court. *State v. Ryan, supra*; *State v. Alexander*, 215 Neb. 478, 339 N.W.2d 297 (1983). The probability of success and the duration of rehabilitative treatment must be considered in determining whether detention will be in the juvenile justice system or in the criminal justice system. *State v. Ryan, supra*; *State v. Alexander, supra*. The district court may properly refuse to waive jurisdiction over a criminal proceeding to the juvenile court where the district court complies with the provisions of statute and makes a statement of its findings which provides sufficient specificity to permit meaningful review by this court. *State v. Stewart, supra*. The record discloses the district court's compliance with these requirements.

As this court has previously noted in the civil context, "judicial abuse of discretion" means that the reasons or rulings of the trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. See, e.g., *Wachtel v. Beer*, 229 Neb. 392, 427 N.W.2d 56 (1988); *D.S. v. United Catholic Soc. Servs.*, 227 Neb. 654, 419 N.W.2d 531 (1988); *Bittner v. Miller*, 226 Neb. 206, 410 N.W.2d 478 (1987); *Fredericks v. Western Livestock Auction Co.*, 225 Neb. 211, 403 N.W.2d 377 (1987). The district court did not abuse its discretion in refusing to waive jurisdiction over the person of Trevino in these proceedings. Trevino's first assignment of error is without merit.

## II. Sufficiency of Evidence

Trevino's second summarized assignment of error asserts the district court erred in determining the evidence was sufficient to support the verdicts of guilt. We begin by noting that in making those determinations, we are bound by the rule that after a jury has considered all the evidence and returned a verdict of guilty, that verdict may not, as a matter of law, be set aside on appeal for insufficiency of the evidence, if the evidence sustains some

rational theory of guilt. *State v. Lewis, ante* p. 224, 430 N.W.2d 686 (1988); *State v. Jackson,* 225 Neb. 843, 408 N.W.2d 720 (1987); *State v. Evans,* 215 Neb. 433, 338 N.W.2d 788 (1983). Moreover, in determining the sufficiency of the evidence to sustain a conviction, it is not the province of this court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence; the verdict of the fact finder must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support the verdict. *State v. Quiring, post* p. 535, 432 N.W.2d 243 (1988); *State v. Jones, post* p. 528, 432 N.W.2d 523 (1988); *State v. Bustos, post* p. 524, 432 N.W.2d 241 (1988); *State v. Lewis, supra; State v. Tatara, ante* p. 279, 430 N.W.2d 692 (1988).

The application of these rules, as the analysis which follows establishes, compels the conclusion that the evidence overwhelmingly supports each of the jury's six findings of guilt and that the district court was thus correct in its determination to overrule each of Trevino's many motions challenging the sufficiency of this evidence; thus, Trevino's second summarized assignment of error is without merit.

At about 12:50 on the morning of September 14, 1986, Marco Perez, then age 19, and his brother, Ramon Perez, then about age 17, stopped at the Madrid Tavern in Madrid, Nebraska, for something to eat. Mark Heil and his sister, Melissa, were traveling with the Perezes in Ramon Perez' automobile and had been driving around together for about half an hour. Although there may have been some beer in the automobile, Ramon Perez, who is a nondrinker, had not consumed any of it. Ramon Perez parked his automobile on Main Street, slightly north and west of the Madrid Tavern and immediately north of a parked pickup truck.

All four passengers in the Perez automobile then entered the Madrid Tavern, where Chet Harger was working. Trevino was among the several patrons already in the tavern. The two Perez brothers ordered some fast-food items from Harger. While the four traveling companions were waiting, Trevino asked them if they would care to wager $1,000 against Trevino's ability to drink a glass of unidentified liquid; the four declined, took their

food, and left the tavern. They had been inside the tavern a total of 2 or 3 minutes.

Outside, the four stood between the Perez automobile and the pickup truck, talking. After several minutes, Ramon Perez observed Trevino and another person leave the tavern. Trevino was carrying a sack. Trevino and his companion paused outside the tavern, Trevino handed the sack to his companion, and the companion then walked north or northeast across a vacant lot and disappeared. Trevino walked to the edge of the sidewalk near the tavern, pointed a handgun at Marco Perez, said, "You'd better get the fuck out of here," and started shooting. Mark Heil jumped at Trevino, knocking him to the ground. Another shot was fired, and Trevino, by then under Heil, rolled Heil over onto the sidewalk.

People then began to emerge from the tavern, Nick Ross among them. Trevino started moving toward the tavern, pointing his gun at the doorway. Ross retreated within the tavern and told someone inside to call an ambulance.

Trevino then returned to the site of the shootings and pointed his gun at Jon Gilliland and Shelly Lee, who had been some distance away talking to each other. By this time Melissa Heil was screaming, and Trevino pointed his gun at her, saying, "[Y]ou'd better get out of here, she's next." Ramon Perez grabbed Melissa, moved behind his automobile, and then sent Melissa running down the street for help.

Gilliland had been in his pickup truck, which was stopped in the middle of Main Street just north of the scene of the shootings, speaking with Lee through the open window on the driver's side for about a half hour, up to the time of the shootings. Gilliland had noticed the Perezes and Heils standing between the Perez automobile and the pickup truck. Then, according to Gilliland,

> A man came out of the bar, and I heard the first shot. And we looked over there, and I thought it was a firecracker at first. Then, there was couple more shots fired in this direction, pretty rapid. And I didn't know at the time who it was that fell, but it was Marco. And then he turned around this way, and Mark approached him, and there was a couple more shots fired, and that's when Melissa

screamed and come back to my pickup.

After hesitating, Gilliland moved his pickup truck toward the gunman, pulling to within 5 feet of him. Gilliland looked at the gunman, who was carrying a small, shiny gun in his right hand, for 10 or 15 seconds. The gunman then told Gilliland to "[l]eave or I'll shoot," and Gilliland drove off to get the Heils' father.

From about 8 feet away, Trevino and Ramon Perez stared at each other for a time, then Trevino lowered his gun and moved off across a vacant lot to the east, toward the back of a residential building nearby. Police officers arrived minutes later.

Some minutes later, returning to the scene with the Heils' father, Gilliland saw the gunman running east on Highway 23, about one block north of the scene of the shootings. Gilliland gave chase in his pickup truck, following the gunman east on Highway 23, then north into an alley, closing to within 15 feet of the gunman and getting another look at his face. The gunman fell, and Gilliland returned to the scene of the shootings and notified the police officers of the gunman's location.

At approximately 1:10 on the morning of the foregoing events, officers of the Perkins County Sheriff's Department responded to a "shots-fired" call originating in Madrid. When they received the call, then Sheriff Jim Crown and Deputies Scott Phillips and Todd Hatcher happened to be together in a patrol vehicle approximately 2 miles west of Madrid on Highway 23. Three minutes after receiving the call, the officers arrived at the scene and found a crowd gathered in front of the tavern. Upon approaching the crowd, the officers observed Mark Heil lying on the ground, suffering from a wound to the neck. Hatcher subsequently noticed Marco Perez lying in the street, suffering from wounds to the head and chest.

Hatcher used the patrol vehicle radio to summon medical assistance, ascertained that there was nothing he could do to aid the victims himself, and moved the vehicle so as to illuminate a nearby vacant lot. Gilliland then approached Hatcher and stated that the person involved in the shooting was nearby, on the other side of Highway 23. Minutes later, as the ambulances arrived, Hatcher, Crown, and Phillips began moving in the direction indicated by Gilliland. In Hatcher's words,

I went around the corner to go east, and Sheriff Crown went east with me. And I don't — I believe Officer Phillips was behind me at that point. And walking down between these two buildings, and a subject came running down on an angle almost straight towards me here. And I hollered "Freeze" and about the same time Sheriff Crown hollered "Freeze". And he yelled back, "Go ahead shoot, kill me" and swung around between here and kept running east.

Hatcher observed that the suspect "wasn't running normal like a normal person would run. It was kind of a staggered step."

Hatcher pursued the runner, catching him at the back door of a nearby residential building then occupied by Trevino and his family. Crown patted the suspect down and announced there was no gun; Hatcher then handcuffed the suspect. Crown next spoke with two women who had appeared at the door from within the building, one of whom was Trevino's wife, as Hatcher and Phillips escorted the handcuffed suspect back toward their patrol vehicle. At this time, Hatcher observed that the suspect appeared "[u]naware of his surroundings and was kind of out of it." Hatcher felt the suspect may then have been intoxicated; however, no tests of intoxication were performed.

As Hatcher and Phillips escorted the suspect to their vehicle, they walked into the view of the crowd. Some members of the crowd, including Gilliland, Ross, Harger, Raymond Walrod, Todd Marten, and possibly Ramon Perez, approached the two officers, who held the handcuffed suspect between them. Gilliland identified the suspect as the person who had done the shooting. Neither at this time nor later did the police present these persons with a view, nor with photographs, of any other persons as suspects in these crimes.

Approximately 15 to 20 minutes after the deputies arrived in Madrid, the suspect was placed in the patrol vehicle; he was then driven by Phillips to the Perkins County jail in Grant, Nebraska, and subsequently identified as Trevino.

Hatcher and Crown remained at the scene and commenced an investigation, speaking with those present. Hatcher searched the scene of the shooting and the surrounding area for a gun, but none was ever found. Hatcher did find several spent .25-caliber cartridge cases in the immediate area of the

shootings and a spent bullet in the roof of the Perez automobile at the scene. Photographs were taken of the physical evidence, as well as of what appeared to be bloodstains where each of the victims had been found.

The officers learned that a second person may have been with Trevino around the time of the shootings; however, this person was never located.

At approximately 10:20 a.m. on September 14, 1986, Trevino was booked into the Lincoln County jail. In the course of a search prior to admitting him to the jail population, 20 rounds of live .25-caliber Winchester expanding point automatic weapon ammunition were found on Trevino's person.

During the course of performing an autopsy, Dr. Dorothy Wycoff, an anatomic pathologist, removed two spent bullets from Marco Perez' body. She marked them for identification and turned them over to Crown. At trial, Wycoff testified that death was caused by bullet wounds to Marco Perez' heart and lungs.

Investigator Mark Bohaty, a firearms and toolmark examiner with the Nebraska State Patrol Criminalistics Laboratory, testified that the four spent cartridge casings found at the scene of the shootings by police officers had all been fired from the same gun and were identical to the live ammunition recovered from Trevino's person during booking, all being .25-caliber automatic expanding point shells and bullets manufactured by Winchester. Examination of the bullets recovered from Marco Perez' body indicated that they, too, were .25-caliber expanding point bullets manufactured by Winchester.

Forensic serologist Betty Jane Khreiss of the State Patrol Criminalistics Laboratory examined drops or spatters of blood found on the jeans Trevino was wearing when taken into custody. She determined that this blood was the same type in terms of blood group and genetic markers as Mark Heil's blood, and not the same as Trevino's blood. Trevino's expert forensic serologist testified that the bloodstain tests performed by Khreiss were, in his opinion, not reliable. Trevino's expert admitted, however, that his opinion in this regard was the

subject of considerable dispute within the scientific community.

On December 3, 1986, while Trevino was in the booking room of the Keith County Sheriff's Department facility in Ogallala, apparently awaiting transfer to another facility, a Spanish-speaking sheriff's deputy overheard a conversation in Spanish between Trevino and another Hispanic jail inmate, the English translation of which was: "[Inmate] Hey, man, what are you doing here? . . . [Trevino] They said I killed a man. . . . [Inmate] Well, did you do it? . . . [Trevino] Yes, I killed him and he's dead."

Thomas Mahan, then an inmate at the Hitchcock County jail awaiting sentencing, testified as to a conversation he had, out of the hearing of others, on the evening of Saturday, January 24, 1987, when Trevino was brought to that jail. According to Mahan,

> When Mr. Trevino first started discussing his case with me, he told me he was in here for murder and attempted murder of two people. And he told me that he didn't do it, and he told me that his partner or some guy that was with him is the one that done it.

However, in a series of conversations spanning the following day, during which no one else was present, Trevino told Mahan that

> he was in this bar drinking some tequila with this other guy, and they got up to leave. He went over and bought a six-pack of beer. And the beer was put in a paper bag, and they were walking out. And when him and this other fellow were outside they heard some people laughing. So, he hands the beer to him, and he tells his buddy, he says . . . "I'm going to scare the shit out of them". And he told me he pulled out his gun, and walked over and held the gun up to the guy's head and the gun went off. And he said, he just walked up to scare them, but the gun went off and he thought the safety was on. And then he said, he couldn't remember much more except somebody jumping him, and he said he shot him. And then he said that he got up and started to run, and he was running past some old cars and some crates or pallets or something, and run into some bushes. And then he hid in some tank or something.

And he said, he hit the ground and the next thing he knows his friend or his buddy or whatever was there, and helped picked him up. He gave the gun to him and they both split in different directions. And then he said that he got up, and said the next thing he remembered he was on his porch and that's when he got arrested.

Following a court appearance on the succeeding day, Trevino repeated this story to Mahan, but stated that he had run home following the shootings and given the gun to his wife before he was apprehended. Trevino also told Mahan about a plan to persuade the jury of his innocence by presenting himself with longer hair than he had had at the time of the shootings, and with glasses, and by pretending in court to be left-handed.

The next day, again following a court appearance, Trevino repeated the same story of the crime to Mahan, but this time told Mahan that he had hidden the gun near the scene, and he drew a map showing the location of the gun. Mahan, worried by the prospect of continuing to share a cell with Trevino, then contacted jail officials. Mahan subsequently met with a Hitchcock County attorney, a sheriff's deputy, and two investigators from the Perkins County attorney's office, none of whom asked Mahan to solicit any additional information from Trevino.

Two days later, on Thursday, Trevino initiated yet another conversation with Mahan:

He started asking me questions about an automatic gun firing and casings coming out of the gun. He couldn't understand how the casings from the weapon got on the sidewalk. . . . He — said he was standing this way, and held out his hand like this. And he said when the gun fired casings went this way, and he couldn't figure out how the casings wound up on the sidewalk, which was in the other direction. And I explained to him that when you fire an automatic weapon, the casings should come out and back, instead [of] straight out to the side.

Mahan also stated that he had been offered no inducements by the Perkins County attorney or anyone else for his testimony, apart from an attempt to keep his name out of the papers. Upon cross-examination, Mahan stated that Trevino

said he had told Mahan things he had not told his defense attorney.

Ramon Perez' recitation of the facts and in-court identification of Trevino as the assailant were corroborated at trial by the Heils and by Gilliland and Harger, as well as by three bar patrons, Martens, Ross, and Walrod.

We shall now consider, in turn, each of Trevino's six convictions.

### 1. Murder of Perez

As noted earlier, the jury first found Trevino guilty of second degree murder in the death of Marco Perez. Neb. Rev. Stat. § 28-304 (Reissue 1985) provides as follows: "(1) A person commits murder in the second degree if he causes the death of a person intentionally, but without premeditation. (2) Murder in the second degree is a Class IB felony."

We have held that the essential elements of second degree murder are that the murder be done purposely and maliciously. *State v. Ettleman*, 229 Neb. 220, 425 N.W.2d 894 (1988). As noted in *Ettleman*, the state of mind required for second degree murder may be inferred from the evidence of the criminal act. Furthermore, malice, in the context of second degree murder, has been said to denote that condition of the mind which is manifested by the intentional doing of a wrongful act without just cause or excuse and is any willful or corrupt intention of the mind. The evidence adduced at trial supports the jury's implicit findings that Trevino intentionally aimed his loaded gun at Marco Perez and, with intent but without premeditation, shot Perez in the head and chest, causing his death.

### 2. Murder Firearm Use

The jury also found Trevino guilty of use of a firearm to commit a felony against Marco Perez, specifically, the felony of second degree murder. Neb. Rev. Stat. § 28-1205(1) (Reissue 1985) provides in relevant part as follows:

> Any person who uses a firearm . . . to commit any felony which may be prosecuted in a court of this state, or any person who unlawfully possesses a firearm . . . during the commission of any felony which may be prosecuted in a court of this state commits the offense of using firearms to commit a felony.

As noted previously, second degree murder is a felony. A gun is obviously a firearm, and Trevino does not urge otherwise. The evidence adduced at trial supports the jury's finding that Trevino used a gun to feloniously shoot and kill Marco Perez.

### 3. Attempted Murder of Heil

The jury also found Trevino guilty of attempted second degree murder of Mark Heil. The crime of second degree murder, defined at § 28-304 quoted above, is a Class IB felony. Neb. Rev. Stat. § 28-201 (Reissue 1985) provides in relevant part as follows:

(2) When causing a particular result is an element of the crime, a person shall be guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, he intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

(3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

(4) Criminal attempt is:

(a) A Class II felony when the crime attempted is a . . . Class IB felony . . . .

The evidence adduced at trial supports the jury's implicit finding that Trevino intentionally, but without premeditation, shot Mark Heil in the neck, an act "intended or known to cause" Heil's death. It cannot seriously be argued, and Trevino does not argue, that the conduct of intentionally shooting another person in the neck demonstrates anything but one's intent to kill the other person. See, also, *State v. Jackson*, 225 Neb. 843, 408 N.W.2d 720 (1987).

### 4. Attempted Murder Firearm Use

The jury next found Trevino guilty of use of a firearm to commit a felony against Mark Heil, specifically, the felony of attempted second degree murder. Section 28-304, defining second degree murder, § 28-201, defining the crime of attempt, and § 28-1205, defining the crime of use of a firearm to commit a felony, are quoted above and hence need not be set forth again. The evidence adduced at trial supports the jury's implicit

finding that Trevino used a gun to shoot Mark Heil in the neck in an attempt to cause Heil's death.

### 5. Assault of Heil

The jury also found Trevino guilty of first degree assault against Mark Heil. Neb. Rev. Stat. § 28-308 (Reissue 1985) provides as follows: "(1) A person commits the offense of assault in the first degree if he intentionally or knowingly causes serious bodily injury to another person. (2) Assault in the first degree shall be a Class III felony."

Dr. L.C. Potts, a physician and surgeon from Grant, Nebraska, attended Mark Heil in the Perkins County Hospital emergency room immediately after the shooting. According to Potts, Heil was then in critical condition, suffering paralysis from the neck down from what was indicated to be a bullet wound to the neck.

Mark Heil testified that as a result of the shooting, he was hospitalized for a month and spent an additional $3\frac{1}{2}$ months in a rehabilitation center. At the time of trial, a year and a half after the shooting, Mark Heil had no use of his legs, some use of his arms, and no use of his hands. There is ample evidence to support the jury's implicit finding that Trevino had intentionally or knowingly caused serious bodily injury to Mark Heil.

### 6. Assault Firearm Use

Finally, the jury found Trevino guilty of a second use of a firearm to commit a felony against Mark Heil, specifically, the felony of first degree assault. Section 28-308, defining first degree assault, and § 28-1205, defining the crime of use of a firearm to commit a felony, have already been set forth. The evidence supports the jury's implicit finding that Trevino used a gun to shoot Mark Heil in the neck in the course of intentionally or knowingly causing serious bodily harm to Mark Heil.

### III. Evidence Admitted

Trevino's next summarized assignment of error urges upon this court the view that the district court erred in admitting certain evidence over Trevino's objections, repeatedly stated in motions in limine, motions to suppress, and objections at trial. Specifically, Trevino complains of the district court's rulings (1) admitting in-court identifications of Trevino as the gunman by

eyewitnesses to the crimes, (2) allowing Mark Heil to testify within view of the jury, and (3) admitting Khreiss' testimony. We shall consider each of these complaints in turn, mindful overall that the admission or exclusion of evidence is a matter within the discretion of the trial court, whose ruling is not to be disturbed on appeal absent an abuse of that discretion. *State v. Wells*, 229 Neb. 89, 425 N.W.2d 338 (1988).

## 1. Eyewitness Identifications

The gist of Trevino's argument as to the admission of the eyewitness identifications of Trevino was stated by defense counsel at the suppression hearing: "Mr. Trevino is taken into custody, is brought himself in handcuffs to an angry crowd. He's the only Hispanic that they see, he's handcuffed between two officers, what would any crowd say under those circumstances. If anything could be suggestive or violating due process that would be."

A claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it. *State v. Richard*, 228 Neb. 872, 424 N.W.2d 859 (1988) (quoting *Stovall v. Denno*, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967)). In *Richard, supra*, this court stated that evidence of an extrajudicial identification is admissible when made under circumstances precluding the suspicion of unfairness or unreliability and where the person making the out-of-court identification is present at the trial and subject to cross-examination.

The factors to be considered in determining the likelihood of misidentification, the first aspect of the *Richard* test, are the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *State v. Richard, supra* (quoting *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972)).

The evidence adduced at trial shows that each of the eyewitnesses had ample opportunity to observe Trevino during a period of at least 30 minutes leading up to the shootings, during the shootings, and immediately following the shootings,

all prior to the time Trevino ran off and was subsequently returned to the scene in custody. While several of the eyewitnesses gave Trevino only passing attention until the shootings took place, others had their attention fixed on him. In particular, Walrod, who was in the tavern when Trevino arrived and before the arrival of the victims, had his attention drawn to Trevino when, in his words, "I see him over there take the gun from underneath his coat on this side, and bring it around and stick [it] in this right side underneath his jeans and shirt there." At this time, Walrod was standing between 20 and 25 feet from Trevino, and nothing obstructed his view of Trevino. After the shooting, Walrod saw Trevino return to the open door of the tavern and point his gun at it. As previously discussed, both Ramon Perez and Gilliland also had their attention fixed on Trevino for significant periods around the time of the shootings and before Trevino's later appearance on the scene in custody.

Although Trevino attempts to make much of minor variations in the eyewitnesses' descriptions of Trevino, the record shows that all of the eyewitnesses to these crimes were remarkably consistent in describing Trevino as a young, Hispanic male of medium height and build, having, at the time of the crimes, remarkably short hair. Photographs of Trevino taken in the course of booking some 9 hours after the crimes conform to this description. Both at the scene and later in court, all eyewitnesses who identified Trevino as the assailant exhibited a high degree of certainty in their identifications. Finally, the amount of time which elapsed between the shootings and the subsequent "confrontation" between the eyewitnesses and Trevino, then in custody at the scene, was, by all accounts, about 20 minutes. It was clearly permissible for the district court to infer that the eyewitnesses' memory of the events they had witnessed would be fresh and accurate after the passage of such a short time.

As to the second aspect of the *Richard* test, the ability to cross-examine the person making the extrajudicial identification, we note that each of the eyewitnesses to the crimes who identified Trevino at the scene or who viewed him in custody at the scene was produced by the prosecution at trial

and subjected to cross-examination.

Trevino urges that the eyewitnesses' in-court identifications were tainted by the view they had of Trevino in custody 20 minutes after the shootings. The evidence is to the contrary, indicating that the eyewitnesses' in-court identifications were based on independent recollections of observations made prior to, during, and immediately following the shootings and before Trevino reappeared upon the scene in custody. An in-court identification is not to be suppressed if based on an independent recollection untainted by the intervening identifications. *State v. Richard*, 228 Neb. 872, 424 N.W.2d 859 (1988) (citing *United States v. Crews*, 445 U.S. 463, 100 S. Ct. 1244, 63 L. Ed. 2d 537 (1980)). Furthermore, two eyewitnesses to the crimes who did not see Trevino in custody at the scene, Mark and Melissa Heil, also positively identified Trevino in court as the assailant and were themselves subjected to cross-examination.

### 2. In-Person Testimony of Mark Heil

Trevino next argues that Mark Heil should not have been permitted to appear before the jury

> for the reason that [his] injury and disability . . . would be a highly inflammatory matter . . . . When they brought Mark Heil in the Courtroom incapacitated in a wheel chair, there was a marked change in the response and consideration of the jury with respect to any evidence offered after that time in the trial of the case in the opinion of the defendant's counsel.

Brief for appellant at 37. The record before us is devoid of evidence regarding Mark Heil's physical appearance at the time of trial and similarly devoid of evidence regarding the jury's observable or otherwise communicated reaction to Heil's appearance, the proffered opinion of Trevino's counsel notwithstanding.

Trevino's argument seems to take two tacks: on the one hand, Trevino appears to argue that Mark Heil's physical appearance was somehow "inadmissible"; on the other, that there was jury misconduct in the sense that the jury was improperly swayed by emotion upon the sight of Mark Heil, presumably being drawn to render a false verdict as a result.

It can be inferred from Mark Heil's testimony regarding the

loss of the use of his hands and legs that Heil was not independently ambulatory and required some assistance in taking the stand. Such observable aspects of Mark Heil's postshooting condition are clearly relevant to the element of "serious bodily injury" contained in the charge of first degree assault against Trevino. § 28-308. It is within the trial court's discretion to admit or exclude evidence on the ground of relevancy, and such rulings will be upheld absent an abuse of discretion. *State v. DeGroot, ante* p. 101, 430 N.W.2d 290 (1988); *State v. Hinn*, 229 Neb. 556, 427 N.W.2d 791 (1988). The district court did not abuse its discretion in allowing Mark Heil to testify in view of the jury.

Neither is there anything in the record to support Trevino's alternative contention that the jury was guilty of some sort of misconduct by permitting itself to be emotionally swayed by Mark Heil's appearance, rather than fairly considering the evidence.

In *State v. Woodward*, 210 Neb. 740, 745, 316 N.W.2d 759, 762 (1982), this court, commenting on language now found at Neb. Rev. Stat. § 27-606(2) (Reissue 1985), observed,

> While it is true that one may not inquire as to whether the presence of the evidence affected the juror's mind, it is proper and necessary that evidence be presented by the objecting party to show that *extraneous prejudicial information* was improperly brought to the jury's attention. In this case, that burden, required to be carried by Woodward, was not met.

(Emphasis in original.)

Accordingly, the district court did not abuse its discretion in permitting the jury to observe the consequences of Trevino's actions.

### 3. Khreiss Testimony

Trevino next urges upon this court the view that

> the acceptance of [Khreiss'] evidence over the defendant's objection was highly prejudicial and that a substantial miscarriage of justice did occur. [Khreiss] did not determine whether or not her specimen had been contaminated. Further, she consumed the entire sample, so that her work could not be checked. She used a test

acknolwedged [sic] to be unreliable by the very person who developed the test under a grant from the LEAA, Dr. Grunbaum.

Brief for appellant at 44. Moreover, Trevino complains that Khreiss "did not produce photographs taken through her microscope so that the defendant's witness could examine her findings." Brief for appellant at 43. This second complaint is unavailing, for, as the State correctly points out in its brief in this court at 33 (citations to the record omitted),

there is nothing in the record to indicate that she was asked to do so by either party . . . . Further the defendant did not request a continuance to obtain such photographs either for his cross-examination of Ms. Khreiss or the subsequent testimony of his own expert witness . . . . The record does disclose that defense counsel vigorously cross-examined Ms. Khreiss concerning the basis for her opinion and the facts on which it was based.

Trevino's assertions regarding Khreiss' "sample" apparently relate to her testimony concerning the bloodstains found on the jeans Trevino was wearing when booked, stains which Khreiss testified matched Mark Heil's blood type and genetic characteristics, but not Trevino's.

The opinion of an expert witness is properly admitted into evidence where the scientific or technical basis of the opinion and the specific facts on which it is based are before the jury, and the opposing party has the opportunity to cross-examine such witness as to these foundational matters. See *State v. Miner*, 216 Neb. 309, 343 N.W.2d 899 (1984).

In *State v. Batchelor*, 191 Neb. 148, 214 N.W.2d 276 (1974), the defendant was convicted of criminal sale of a controlled substance. The State's expert, a chemist who had analyzed a tablet seized from the defendant, had been called to testify about the chemical composition of the tablet, and was allowed to do so over defendant's objection notwithstanding the fact that the chemist's tests had entirely consumed the tablet, leaving nothing for the defendant to test independently. This court held that the district court did not abuse its discretion in finding that the defendant had not been "negligently or intentionally deprived of a right to analyze the tablet," and that the

admission of the chemist's testimony was proper. *Id.* at 149, 214 N.W.2d at 277.

In *State v. Vernon*, 218 Neb. 539, 356 N.W.2d 887 (1984), this court, quoting *California v. Trombetta*, 467 U.S. 479, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984), concluded that " 'the Due Process Clause of the Fourteenth Amendment does not require that law enforcement agencies preserve breath samples in order to introduce breath-analysis tests at trial.' " *Vernon* at 541-42, 356 N.W.2d at 890. See, also, *Arizona v. Youngblood*, _____ U.S. _____, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988).

Clearly, it is no abuse of discretion to admit expert testimony regarding the analysis of a substance necessarily consumed in testing, provided that the scientific or technical basis of the expert's opinion and the specific facts of the case on which the expert's opinion is based are before the jury and that the opposing party has the opportunity to cross-examine the expert as to these foundational matters. See, *State v. Miner, supra*; *State v. Vernon, supra*; *State v. Batchelor, supra*.

Although the tests Khreiss performed consumed the stains on Trevino's jeans, the scientific basis of Khreiss' expert opinion regarding these stains and the relevant facts of the case were before the jury, and Trevino had the opportunity to cross-examine Khreiss regarding the scientific or technical basis of her opinion and the specific facts upon which it was based.

Trevino also complains that the tests performed by Khreiss were not reliable. Trevino's expert offered this opinion at trial, and the jury determined the weight it would accord this opinion. (We note that Trevino's expert was not the "Dr. Grunbaum" mentioned in Trevino's brief in this court; in fact, no "Dr. Grunbaum" offered any testimony at all, although his name was mentioned in questions propounded by Trevino's counsel at trial.)

Trevino's third summarized assignment of error is without merit.

### IV. Evidence Excluded

Trevino's next summarized assignment of error asserts that the district court erred in refusing to admit the testimony of Dr. Kenneth Deffenbacher and in refusing to admit certain testimony of Hollis Compton, Trevino's private investigator.

We shall deal first with testimony offered through Deffenbacher, and then with Compton's.

### 1. Deffenbacher Testimony

The district court sustained the State's motion in limine to exclude the proffered testimony of Deffenbacher as to the reliability of eyewitness testimony. In an offer of proof outside the presence of the jury, Trevino then set forth that Deffenbacher, a professor of psychology, would testify concerning "human perception and memory." Specifically, Deffenbacher was prepared to testify that high levels of stress interfere with memory for details of the stressful event and that presentation of a weapon in a high-stress situation interferes with perception of other things in the situation. In the course of this offer of proof, Deffenbacher himself noted that it is difficult for research scientists investigating memory to simulate real-life situations. In Deffenbacher's words,

> The really tough one is simulating high levels of real life terror. To do that one might have to, without someone else's knowledge, aforeknowledge, stick a gun in their face. That's illegal and unethical. And so we try to do our best. There have been a couple of field studies where a psychologist happened by right after a shooting takes place or something. But in general we try to do our best to ethically scare people in the laboratory.

Moreover,

> in the behavioral social sciences, as in many other sciences, scientific results are probablistic [sic]. That is, there is a value stated, and in this particular case I would be talking about the typical amount of effect on a typical person in similar circumstances. Now, clearly any given individual in that circumstance might have — the variable might have more effect on them or less. But short of actually being able to test extensively a given individuals [sic], the best prediction still as to how much affect [sic] that variable would have on him or her is the average amount of effect obtained in studies obtained over a large number of people. So it's probablistic [sic] information, but we use probablistic [sic] information a lot in life to make justments [sic] about things we should do.

This court considered the admissibility of expert psychological opinion regarding the reliability of eyewitness testimony in *State v. Ammons*, 208 Neb. 812, 305 N.W.2d 812 (1981):

> The general rule is that expert testimony is admissible only if it will be of assistance to the jury in its deliberations and relates to an area not within the competency of ordinary citizens. If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, expert testimony may be admissible. Neb. Rev. Stat. § 27-702 . . . . The expert testimony offered by the defendant in this case met none of those requirements. The accuracy or inaccuracy of eyewitness observation is a common experience of daily life. Such testimony would invade the province of the jury.

*Id.* at 814-15, 305 N.W.2d at 814.

Trevino seeks to distinguish *Ammons, supra*, by asserting:

> In [*Ammons*], the Nebraska Supreme Court excluded such evidence for the reason that there was one basic witness who had ample opportunity to make an independent identification of the accused, and there were not conflicting eye-witness accounts. In cases such as the present case, you have a multitude of witnesses, no two of which give the same account for the same incident.

Brief for appellant at 46. Setting aside this mischaracterization of what we have already observed to be, on the whole, remarkably consistent testimony by a variety of eyewitnesses to these crimes, Trevino's brief misses the point of this court's holding in *Ammons*.

*Ammons* is not concerned with the expert's ability to explain inconsistency among witnesses but, rather, with the expert's ability to assist the jury in understanding evidence which is beyond the ken of common experience, howsoever many witnesses testify and regardless of the consistency or inconsistency of their testimony. *Ammons* stands for the proposition that it is not for an expert to suggest to the jury how a witness' testimony shall be weighed or evaluated; it is not, in short, for an expert to testify as Deffenbacher offered.

Deffenbacher himself alluded to two of the reasons for this rule. First, investigations of eyewitness reliability cannot duplicate many real-world conditions, and it is with behavior in the real world that the court is concerned and the jury acquainted. It is ironic that Deffenbacher chose as his example of the research scientist's limitation in this regard precisely the condition to which many of the eyewitnesses in this case had been subjected: a gun had been stuck in their faces, creating a condition which Deffenbacher indicated would not be within the scope of his discipline's power to re-create and study.

Second, the knowledge of behavioral scientists, such as psychologists, is probabilistic, couched in terms of averages, standard deviations, curves, and differences between groups. A court, however, is not concerned with the average eyewitness' reliability but with the reliability of the specific witnesses before it, who may vary from the average in probabilistic but ultimately unknown ways. It is not the research behavioral social scientist who is in a position to assess a specific witness' reliability; the jury, which views the witness as an individual, is best able to collectively determine, on the basis of common human experience as yet unsurpassed by laboratory research, how to weigh what an individual witness has to say.

This issue is controlled by this court's holding in *State v. Ammons, supra.* Clearly, the trial court properly exercised its discretion in refusing to receive Deffenbacher's testimony.

### 2. Compton Testimony

Trevino also complains of the district court's ruling sustaining the State's objection to the following question propounded through his attorney to Compton:

> Q. Have you — after reading the statements and making your investigation in this case and interviewing the witnesses that you have interviewed, based upon your examination of the scene of the crime, the manner in which it was handled, the persons involved, do you have an opinion as to whether or not the investigation in this matter is complete? And if you have an opinion, please just state yes or no?
>
> [Compton] No, — Excuse me, yes, I have an opinion.
> . . .

Q. And what is that opinion?

The State then interposed an objection, which the court sustained.

Trevino asserts, in essence, that the investigating officers could have done more than they did to identify and locate the other man seen leaving the Madrid Tavern with Trevino shortly before these shootings occurred. Apparently, Trevino would have this court conclude, in the absence of an offer of proof at trial, that Compton's testimony, if allowed, would have been to this effect. Assuming for purposes of argument that such would have been Compton's testimony, the fact remains there would be no relevance to such a statement. It was with Trevino's guilt or innocence that the trial was concerned, not with the investigation per se. That investigation either produced sufficient evidence to sustain a finding of guilt or it did not, a question resolved against Trevino by the jury and clearly supported by the evidence adduced at trial.

### V. Sentences

Finally, in his last summarized assignment of error, Trevino asserts that the sentences imposed by the district court are excessive in general, and, specifically, in that a sentence was imposed twice for Trevino's use of a firearm to commit a felony upon Mark Heil, once with regard to attempted murder and once with regard to assault.

As frequently stated, a sentence imposed within the limits prescribed by statute will not be set aside as excessive absent an abuse of discretion by the sentencing judge. *State v. Lewis, ante* p. 224, 430 N.W.2d 686 (1988); *State v. Berkman, ante* p. 163, 430 N.W.2d 310 (1988); *State v. Thomas,* 229 Neb. 635, 428 N.W.2d 221 (1988); *State v. Maeder,* 229 Neb. 568, 428 N.W.2d 180 (1988). In imposing a sentence, a trial court should consider, among other things, the defendant's age, mentality, education, experience, and social and cultural background, as well as his past criminal record or law-abiding conduct, motivation for the offense, nature of the offense, and the amount of violence involved in the commission of the crime. *State v. Thomas, supra.*

For the crime of second degree murder of Marco Perez, the district court sentenced Trevino to life imprisonment, with

solitary confinement each year on September 14. Neb. Rev. Stat. § 28-105 (Reissue 1985) provides that the penalty for second degree murder, as a Class IB felony, shall be "Maximum-life imprisonment Minimum-ten years imprisonment." We find no abuse of discretion in the sentence pronounced.

For the crime of attempted second degree murder of Mark Heil, the district court sentenced Trevino to imprisonment for a period of 15 to 30 years, to be served consecutively to the sentence for second degree murder. Section 28-105 provides that the penalty for attempting to commit a second degree murder, as a Class II felony, shall be "Maximum-fifty years imprisonment Minimum-one year imprisonment." We find no abuse of discretion in the sentence pronounced.

For the crime of first degree assault of Mark Heil, the district court sentenced Trevino to 3 to 6 years' imprisonment, to be served concurrently with the sentence for attempted second degree murder. Section 28-105 provides that the penalty for a first degree assault, as a Class III felony, shall be "Maximum-twenty years imprisonment, or twenty-five thousand dollars fine, or both." We find no abuse of discretion in the sentence pronounced.

For the crime of use of a firearm in the Perez murder, the district court sentenced Trevino to 3 years' imprisonment, consecutive to all sentences above. Section 28-105 provides that the penalty for the use of a firearm in the commission of a felony is a maximum of 20 years' imprisonment, or a $25,000 fine, or both. We find no abuse of discretion in the sentence pronounced.

Finally, for the crime of use of a firearm in the attempted murder of Mark Heil, the district court sentenced Trevino to 3 years, to be served consecutively to all sentences above; and for use of a firearm in the assault on Mark Heil, the district court sentenced Trevino to an additional 3 years, to be served consecutively to all sentences above.

Trevino's suggestion that imposing multiple punishments in the form of two convictions for the use of a firearm upon Mark Heil in but a single event somehow offends the double jeopardy clause of the 5th amendment to the U.S. Constitution, as

applied to the states by the 14th amendment to that Constitution, finds no support in the law. As noted in *Missouri v. Hunter*, 459 U.S. 359, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983), where a legislature specifically authorizes cumulative punishment under two statutes proscribing the same conduct, the prosecution, in a single trial, may seek and the court impose such cumulative punishment without offending the double jeopardy clause of the fifth amendment to the U.S. Constitution.

Section 28-1205(3) provides: "The crime defined in this section shall be treated as a separate and distinct offense from the felony being committed, and sentences imposed under the provisions of this section shall be consecutive to any other sentence imposed."

This court has held that the language of § 28-1205(3), to the effect that sentences under this section must be imposed consecutively to any sentence imposed for the predicate felony, is mandatory and not within the discretion of the sentencing court. *State v. Stratton*, 220 Neb. 854, 374 N.W.2d 31 (1985). Moreover, this court has previously determined that assault in the first degree is not a lesser-included offense of attempted murder in the second degree. *State v. Lovelace*, 212 Neb. 356, 322 N.W.2d 673 (1982).

Trevino was sentenced for use of a firearm in the commission of two separate felonies committed upon the person of Mark Heil. Section 28-1205 mandates separate sentencing for each instance of the use of a firearm to commit a felony. The jury having found Trevino guilty of both of the distinct predicate offenses of attempted second degree murder and first degree assault, the consecutive sentences imposed by the district court are supported by the law and the evidence, and mandated by the language of § 28-1205. Once again, we find no abuse of discretion in the sentence pronounced.

## DECISION

There being no merit to any of Trevino's assignments of error, the judgments and sentences of the district court are affirmed.

AFFIRMED.

GRANT, J., dissenting in part.

I dissent only from the judgment of this court affirming defendant's convictions and sentences for the two crimes of assault in the first degree and use of a firearm in the commission of that felony. The decisive point on this issue is not raised by defendant but seems to me to be such plain error it should be addressed.

I agree completely that defendant's convictions and sentences as to the crime of murder in the second degree and the use of a firearm in the commission of that felony, in the murder of Marco Perez, should be affirmed. I also agree completely that the convictions and sentences as to defendant's crime of attempted murder in the second degree and the use of a firearm in the commission of that felony, in the attempted murder of Mark Heil, should be affirmed. I believe it was error for the trial court to impose an additional conviction and sentence on defendant for first degree assault and use of a firearm, also arising from the attempted murder of Mark Heil. As I understand the facts, both the charge of attempted murder in the second degree and the charge of first degree assault rest on defendant's action in shooting Mark Heil in the neck.

The action of this court, in my judgment, constitutes a violation of defendant's right not to be "twice put in jeopardy for the same offense"—a right guaranteed to defendant by Neb. Const. art. I, § 12, and by U.S. Const. amend. V. That right encompasses the right to be protected "against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969). I, therefore, respectfully dissent from the affirmance of that part of defendant's conviction and sentencing.

The opinion of the majority on this point rests, in large part, on this court's holding in *State v. Lovelace*, 212 Neb. 356, 322 N.W.2d 673 (1982), where we held that assault in the first degree is not a lesser-included offense of attempted murder in the second degree. In the *Lovelace* case, the conviction of Lovelace for the crime of first degree assault was reversed and the case dismissed on the grounds that Lovelace was charged only with attempted murder in the second degree and the use of a firearm on the commission of that felony. The ground for the reversal

and dismissal of the first degree assault charge was apparently that defendant had not been afforded his constitutional rights, in that the crime of assault in the first degree had never been charged against defendant, and that since this court determined such an assault was not a lesser-included offense of attempted second degree murder, defendant had never been properly charged, arraigned, and tried on the charge of which he was convicted. That determination acted as a constitutional shield for the defendant in requiring that he had to be afforded due process before he could be convicted. The *Lovelace* case addressed the double jeopardy issue in dicta only, in that it invited further prosecution of Lovelace on the assault offense, because the assault offense was held to be a separate and distinct crime. That use of a constitutional shield in *Lovelace* has been transformed to a constitutional sword in the hands of the State in the present case before us.

I recognize, as does the majority opinion, that in *Missouri v. Hunter*, 459 U.S. 359, 368-69, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983), the U.S. Supreme Court stated:

> Thus far, we have utilized that rule [in *Whalen v. United States*, 445 U.S. 684, 100 S. Ct. 1432, 63 L. Ed. 2d 715 (1980)] only to limit a federal court's power to impose convictions and punishments when the will of Congress is not clear. Here, the Missouri Legislature has made its intent crystal clear. Legislatures, not courts, prescribe the scope of punishments.
>
> Where, as here, a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the "same" conduct under [*Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932)], a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.

That holding permits the imposition of a consecutive sentence for using a firearm in both the second degree murder of Marco Perez and the attempted second degree murder of Mark Heil, because, as the majority opinion notes, the Legislature of Nebraska, in Neb. Rev. Stat. § 28-1205(3)

(Reissue 1985), has specifically provided for such cumulative punishment.

The Nebraska Legislature, however, has not authorized cumulative punishments for the same conduct in attempting murder and committing an assault, when those offenses arise from the "same conduct." In this case, the majority has used a judicial interpretation of "lesser-included offenses" as a springboard to impose cumulative sentences for the same offense. I believe such action violates defendant's constitutional, double jeopardy rights. I would reverse and dismiss defendant's convictions for first degree assault and use of a firearm in that assault. I would affirm defendant's other convictions.

BOSLAUGH, J., joins in this dissent.