IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. MOORE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

SHANE M. MOORE, APPELLANT.

Filed December 19, 2023.    No. A-23-581.

Appeal from the District Court for Lancaster County: RYAN S. POST, Judge. Affirmed.

Trevin H. Preble, of Preble Law Firm, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and Jacob M. Waggoner for appellee.

PIRTLE, Chief Judge, and MOORE and RIEDMANN, Judges.

PIRTLE, Chief Judge.

## I. INTRODUCTION

Shane M. Moore appeals the decision of the district court for Lancaster County denying his motion to waive jurisdiction to the juvenile court. We find no abuse of discretion in the court's denial of the motion to waive jurisdiction and, therefore, affirm.

## II. BACKGROUND

Moore is alleged to have repeatedly stabbed a 15-year-old victim, K.P., on October 13, 2022. Moore was 14 years, 11 months old at the time of the alleged offense. On January 18, 2023, Moore was charged in district court with first degree attempted murder, first degree assault, and two counts of use of a deadly weapon to commit a felony, all of which are Class II felonies. On April 7, Moore motioned to waive jurisdiction to the juvenile court. A hearing was held on June 26 and July 6.

- 1 -

## 1. MOORE'S HISTORY OF MENTAL HEALTH ISSUES

Moore and his family moved to Waverly, Nebraska, from Colorado in September 2022. While living in Colorado, Moore exhibited frequent behavioral issues and suffered from severe mental health crises.

Due to his aggressive behavior, Moore was suspended from school multiple times. During the 2017-18 school year, he was suspended for 3 days after choking another student. Several weeks later, he punched a student in the stomach on the school bus. As this was the second time he had punched someone on the bus, he was suspended from riding the bus for the remainder of the year. He was then suspended from school for another 3 days in 2020 due to a fight with another student and then issued a warning in 2021 for threatening to "jump" someone else.

Moore's mental health problems escalated in early November 2021, which resulted in him being hospitalized on two occasions. On November 7, he was brought to a hospital because he was self-harming and had suicidal and homicidal ideations. He reported that he wanted to "kill everyone in [his] entire family" "by cutting their throats as they [slept]." He also told providers that he attempted to kill his 14-year-old stepbrother the previous month by offering him a drink that contained crushed up medications. He stated he wanted to kill his stepbrother because his stepbrother "attempt[ed] to do stuff to [him] sexually." Moore also reported that he attempted to kill his 15-year-old stepsister the previous day by "placing her in a headlock until she turned purple." He stated that he only stopped choking her because she punched him in the face. With the identification of these problems, Moore was hospitalized for 5 days. According to his mother, he was only released because the hospital did not have room to house him.

Approximately a month after his discharge, Moore was hospitalized in another mental health hospital for 7 days. During his second period of hospitalization, he made numerous concerning comments to the health care providers. He described that in 2 weeks, on December 18, 2021, he planned to kill his stepbrother. On that day, he planned to take him to a nearby park, "stab him in the back, stab his knees so he can't run, and then slash his throat and cut out his heart." He further told health care providers that he despises his stepbrother for no reason and attempted to kill him twice in the past. The first time was in August 2021, when he tried to drown him in a nearby lake. The second attempt was when he offered him a drink with crushed-up medications mixed in it. Moore also reported his prior attempt to kill his stepsister and stated that he planned to kill her "as soon as he sees her."

Moore further threatened the behavioral health specialist at the hospital saying that he was "waiting for [his] time and then [was] going to hurt [them]." He went on to say "honestly, I just want to kill someone right now. I'm trying to figure out how" and expressed that he "looks forward to killing people." He then described a plan to stab the police officer at his school and take his gun. Additionally, Moore reported that he likes to kill animals and set fires.

After he was discharged from the hospital in December 2021, Moore visited his primary care physician every two weeks and filled out mental health forms each time. Although he visited a therapist once, it was not a good match and he did not see anyone else going forward. Also following his discharge, Moore continued to take several medications to control his impulses. One of these medications was Abilify. His hospital discharge paperwork reported that the Abilify helped his depression and made him able to "control himself a lot more and constrain any angry

thoughts." However, the paperwork also suggested that Moore understood what the medical providers wanted to hear and indicated that could be a reason his behavior began to improve.

In February 2022, Moore was suspended from school again. He told other students that he was expelled from his previous school for stabbing another student. He also made comments about killing other students' families. After one of those students reported what he had said, Moore threatened that he was "going to beat the fuck out of [him] for snitching." Due to these actions, Moore was suspended from school for 5 days.

Once the family moved to Waverly in September 2022, Moore's family lost their health insurance which impacted their ability to afford his medication. Although he was still taking two of his prescribed medications, they could not afford the Abilify prescription until they had health insurance. Without the Abilify, Moore's mother stated that his depression resurfaced and he reverted back to his previous behaviors. Moore also regularly missed classes. His mother reported that during "the whole time he was at Waverly he completed one whole day of school."

## 2. STABBING INCIDENT

On October 13, 2022, Moore went to several stores in Waverly looking for a potential victim to kill. In the first store, he saw a woman but "just didn't think [she was] the person . . . to do it to," explaining that "it wouldn't seem satisfying" and that "it wouldn't fulfill . . . [his] need." He then waited in a different store's bathroom for someone to walk in so he "could do it then, but no one walked in." After that, Moore talked to an employee at a car wash to determine if he could be a potential victim. That is when Moore saw K.P. walking by and thought he was someone that he "could do it to" because "he looked weak [and] easy to hurt."

Moore proceeded to follow K.P. and eventually approached him saying that he wanted to be friends. K.P. indicated that he was not interested in being friends and started to walk away. When K.P. turned his back, Moore stabbed him several times. Despite being stabbed, K.P. was able to successfully fight back and get on top of Moore. However, Moore convinced him that he would stop if K.P. let him go. After K.P. released him and began to walk away, Moore reinitiated the attack by stabbing him two more times. Moore then left K.P. on the ground, thinking that he had killed him.

After the attack, Moore called the police. He told 9-1-1 dispatch that he was calling "to report a murder" and explained "I did it, by the way, just so you know; I'm not going to lie to anybody." He explained that he stabbed the victim and offered to lead police to "the body." When asked if it was his plan to stab someone, he responded "oh yeah. Been thinking about it for a long, long time." Despite Moore's belief that K.P. was dead, medical assistance arrived in time to save his life.

After Moore was arrested and Mirandized, law enforcement conducted an interview with him. He expressed that his motive for stabbing K.P. was to inflict "as much pain as possible [upon] someone." He stated that he just wanted "to hurt as [many] people as possible" which he felt he needed to do in order to satisfy his needs. He expressed that when he stabbed K.P. "the adrenaline was insane" and that "it kind of felt nice." He continued to describe that he had thought about hurting someone for a long time and the only difference was that he "just went through with it today." He then disclosed a prior plan to kill one of his friends in Colorado but indicated that he was not able to go through with it. He also discussed his past desire to "shoot up" his school in

Colorado. When asked why he did not want to "shoot up" his school in Waverly, Moore expressed that he did not "have the resources," but "most likely" would have done so if he had access to a weapon.

When left alone to speak with his mother, Moore told her "I tried warning you, multiple times" and expressed "[i]t was inevitable." He then told her that he has "to hide [his] pain" and that acting normally was "the art of disguise." When law enforcement returned, they told Moore his charge was going to be first degree attempted murder and asked him how he felt about that. Moore replied, "[I]t don't really matter to me" and expressed that it would not bother him if he had to sit in jail for years. When asked how he felt about what he did, he said he felt "nothing."

### 3. HEARING

On June 26 and July 6, 2023, a hearing was held on Moore's motion to waive jurisdiction to juvenile court. Dr. Stephanie Bruhn, Stanley Loadholt, and Moore's mother, Angela McCormick, testified on behalf of Moore.

Bruhn is a psychologist and conducted Moore's psychological evaluation after he was arrested. She diagnosed him with post-traumatic stress disorder, conduct disorder, an unspecified mood disorder, alcohol use disorder, and cannabis use disorder. She also determined that he had trouble with mood dysregulation and anger management. She further explained that it was important for Moore to receive help from an experienced therapist because he was very manipulative.

Bruhn utilized several methods in assessing Moore. One of these methods was the Millon Adolescent Clinical Inventory which evaluates a person's "personality inventory." Moore's results indicated that his "overriding principle is to exert power and control before others can do the same" and that "[h]e is likely to act forcefully in order to avoid being harmed by others." Based on these results, Bruhn indicated that "he [appears] self-centered and non-empathetic toward others."

Another method Bruhn utilized was the Structured Assessment of Violence Risk in Youth. On this assessment, Moore demonstrated a high rating for "Historical Risk Factors (Exposure to Violence in the Home), Social/Contextual Risk Factors (Peer Rejection, Stress and Poor-Coping, and Lack of Personal/Social Supports) and Individual/Clinical Risk (Negative Attitudes, Risk Taking/Impulsivity, Substance-Use Difficulties, Anger Management Problems, Low Empathy/Remorse, Attention Deficit/Hyperactivity Difficulties, Poor Compliance, and Low Interest/Commitment to School)." Based on this assessment, Bruhn reported that Moore "presents a high level of risk for general community violence" which she testified was the highest level of risk. Overall, Bruhn testified that she believed that it is in Moore's best interest to obtain treatment for his mental illness, and that she believed the services Moore needs are available both in the juvenile and district courts. She also explained that, even with therapy, Moore will need oversight to ensure that he attends school and participates in necessary services.

Loadholt, a juvenile detention officer at the Lancaster Juvenile Detention Center (LJDC), testified next. Loadholt worked with Moore after he was placed at LJDC. He testified that Moore is not the same person he was when he arrived. He "opens up" more, participates in school, engages with others, and has developed better coping skills.

However, Loadholt also testified that since being at LJDC, Moore has been involved in several incidents. He threatened to kill staff and their families, told another juvenile resident that

he was going to kill him, slapped one juvenile resident, punched another juvenile resident, and was physically aggressive with staff on multiple occasions. Additionally, Moore often chose to not attend school and would refuse to cooperate with staff. He "flipped off" staff members, impermissibly touched other residents, talked with other residents when he was not supposed to, and often broke other rules. In total, while at LJDC, Moore was written up 68 times for varying degrees of misbehavior from October 19, 2022, to May 19, 2023.

McCormick was the final witness to testify. She stated that Moore was 100 percent different from the person he was during the first two weeks of his time at LJDC. She attributed much of this change to him taking his medication. Essentially, she indicated that he appeared to be happier now than he used to be.

### 4. DISTRICT COURT'S ORDER

On January 20, 2023, the district court issued an order that denied Moore's motion to waive jurisdiction to the juvenile court. The primary bases for the district court's ruling were Moore's history of poor behavior, the violent nature of the attack, and the threat he poses to the public. The district court explained that he has a history of poor behavior in school and in treatment facilities that indicates an aversion to treatment. Specifically, the court cited Moore's multiple suspensions from school in Colorado for making homicidal threats, bullying, punching another student, and choking other students. The court also cited his poor school attendance in Nebraska and how he was sent home many times due to his behavior. The district court further articulated how he poses a risk to the community. Beyond his decision to stab a juvenile victim at random, the district court cited to Moore's prior attempt to drown one of his siblings, his conduct in setting fires, hitting and pushing people while walking down the street, and contemplating shooting up his school while in Colorado. Based on the cumulation of these past incidents, the district court concluded that there was a sound basis for retaining the case in district court.

### III. ASSIGNMENT OF ERROR

Moore assigns the district court abused its discretion by finding the State met its burden of establishing a sound basis for retention of the case in the district court.

### IV. STANDARD OF REVIEW

A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Cardenas*, 314 Neb. 544, 990 N.W.2d 915 (2023). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

### V. ANALYSIS

Neb. Rev. Stat. § 43-246.01(3) (Reissue 2016) grants concurrent jurisdiction to the juvenile court and the county or district courts over juvenile offenders who (1) are 11 years of age or older and commit a traffic offense that is not a felony or (2) are 14 years of age or older and commit a Class I, IA, IB, IC, ID, II, or IIA felony. Actions against these juveniles may be initiated either in juvenile court or in the county or district court. In the present case, all of the allegations against Moore put him within this category of juvenile offenders.

When an alleged offense is one over which both the juvenile court and the criminal court can exercise jurisdiction, a party can move to transfer the matter. For matters initiated in criminal court, a party can move to transfer it to juvenile court pursuant to Neb. Rev. Stat. § 29-1816(3) (Reissue 2016).

In the instant case, when Moore moved to transfer his case to the juvenile court, the district court conducted a hearing pursuant to § 29-1816(3)(a), which requires consideration of the following factors set forth in Neb. Rev. Stat. § 43-276 (Cum. Supp. 2019):

(a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim or juvenile agree to participate in restorative justice; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

The customary rules of evidence shall not be followed at such hearing and, "[a]fter considering all the evidence and reasons presented by both parties, the case shall be transferred to juvenile court unless a sound basis exists for retaining the case in county court or district court." See § 29-1816(3)(a). "Factors that are considered 'neutral' or 'not applicable' are equivalent to factors that favor transfer because § 43-276 starts with the presumption that the case should be transferred." *State v. Cardenas*, 314 Neb. 544, 562, 990 N.W.2d 915, 928 (2023). The classification of certain factors as "neutral," "not applicable," or "weighing in favor of transfer" are better described as factors that do not support a sound basis for retention. *Id*.

As the Nebraska Supreme Court has explained, in conducting a hearing on a motion to transfer a pending criminal case to juvenile court, "[i]t is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile." *Id.* at 561, 990 N.W.2d at 928. "[I]n order to retain the proceedings, the court need not resolve every statutory factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor." *Id.* "[T]he burden of proving a sound basis for retention lies with the State." *Id.* at 557, 990 N.W.2d at 926.

In his brief on appeal, Moore alleges the district court abused its discretion by giving

a disproportionate amount of weight to the type of treatment [he] would be amenable to, consideration of public safety, consideration of [his] ability to appreciate the nature and seriousness of his conduct, the motivation for the commission of the offense, and by failing to give adequate weight to [his] age, immaturity, and lack of criminal history.

Brief for appellant at 7. He goes on to specifically take issue with three of the factors the district court found weighed in favor of retention: § 43-276(1)(a), the type of treatment he would most likely be amendable to; § 43-276(1)(c), the motivation for the commission of the offense; and § 43-276(1)(g), the consideration of public safety.

### 1. MOORE TAKES ISSUE WITH CERTAIN § 43-276 FACTORS

#### (a) § 43-276(1)(a) – Type of Treatment Juvenile Would Most Likely Be Amendable To

The district court found that § 43-276(1)(a), the type of treatment Moore would most likely be amenable to, weighed in favor of retention because Moore "is not amenable to participating in treatment." In this conclusion, the court cited Bruhn's testimony that Moore was "very good at manipulating others and telling them what they want to hear," along with Moore's history of poor school attendance and disciplinary issues. The court went on to state that while he has made progress at LJDC, his poor school attendance and behavioral problems have continued. Thus, the court concluded that when considering Moore's undisputed need for long-term treatment with his prior lack of amenability to treatment, this factor weighed in favor of retention.

Moore essentially argues that in analyzing this factor the court failed to consider that he did not have access to Abilify prior to stabbing K.P. and while placed at LJDC. He also asserts there was no evidence to support a finding that he will require treatment beyond the age of 19 so the court's conclusion that he will require such treatment was erroneous.

After a review of the entire record, we agree that this factor supports retention in the district court. Moore demonstrated behavioral issues during school in Colorado, during school in Nebraska, during his periods of hospitalization, and most recently, during his time at the LJDC. While Moore's mental health issues were surely a contributing factor for these incidents, his misbehavior persisted even when he received treatment and medication. While he was unable to access Abilify prior to the underlying incident and remains off the medication, there was insufficient evidence presented to determine that his prior lack of amenability to treatment would be resolved if he took Abilify. The only evidence in the record that Abilify made Moore more amenable to treatment was the non-expert testimony of his mother indicating positive behavioral changes and Moore's discharge report from his second hospitalization which stated the drug was benefiting him. This report noted that after starting the medication, Moore was experiencing less depression, was showing a better mood, and was better able to control his emotional responses. However, immediately following that portion of the report, the provider indicated, "[Moore] has figured out that if he says the right things he gets to go home; so I think that is part of what is happening." Moore's own comment to his mother indicating that him acting normally was "the art of disguise" seems to support this theory. Accordingly, the record does not support a conclusion that taking Abilify is determinative of Moore's amenability to treatment. As such, we do not fault the district court for not considering Moore's access to Abilify in its analysis of § 43-276(1)(a).

As to Moore's assertion that there was no evidence presented to support a finding that he will require treatment beyond the age of 19, we disagree. While there was no explicit evidence as to this issue, the record is full of concerning behaviors that sufficiently demonstrate a potential need for long-term treatment beyond the 3 years Moore would be under the jurisdiction of the juvenile court if his motion to waive jurisdiction was granted. Beyond the collection of evidence that displays his past violent tendencies, Moore has consistently demonstrated an inability to behave properly and follow rules even when medicated. At the time of the hearing, Moore had been at LJDC for approximately 7 months. During that time, he was provided with services and medicated for his mental health issues. Despite this, he accumulated 68 violations of varying degrees. These violations included missing school, fighting, being physically aggressive with staff, being physically aggressive with other juveniles, and failing to follow numerous rules and redirections by staff. Given Moore's history and his clear need for long-term treatment, we do not disagree that this factor supports a sound basis for retention in district court.

### (b) § 43-276(1)(c) – Motivation for Commission of Offense

Moore next takes issue with the district court's conclusion as to § 43-276(1)(c), the motivation for the commission of the offense. Moore argues the court did not consider that his stabbing of K.P. was motivated by mental health issues that were a result of being denied access to Abilify.

We agree with the district court that this factor supports a sound basis for retention. At various points after he stabbed K.P., Moore clearly indicated what motivated his actions. When talking with law enforcement afterward, he expressed that his motive for stabbing K.P. was to inflict "as much pain as possible [upon] someone." He also stated, that in planning the attack, he just wanted "to hurt as [many] people as possible" to satisfy his needs. We find the record is insufficient to find that Moore's lack of access to Abilify was the motivating factor behind these "needs." As previously stated, the only evidence that Abilify was suppressing Moore's homicidal ideations was his mother's testimony and his discharge paperwork which attributed a portion of his positive adjustments to an attempt to manipulate the hospital staff. Accordingly, this factor supports retaining the case in district court.

### (c) § 43-276(1)(g) – Consideration of Public Safety

Moore next takes issue with the district court's conclusion as to § 43-276(1)(g), the consideration of public safety. He argues the district court "incorrectly rel[ied] almost solely on the concept of 'deterrence' for a reason to retain the case in district court." Brief for appellant at 8. He contends that it is not clear how the concept of deterrence applies to a minor who committed a criminal act due to their mental health issues. He also asserts the court focused on his behavior without recognizing that he was denied access to Abilify.

In its order, the district court found Moore's charges to be serious and greatly concerning. The court cited his previous attempts to kill his stepbrother and stepsister, his affliction for setting things on fire, how he "likes to walk down the street and hit people and push them down" and his homicidal urges toward others. The court then stated:

> As the Nebraska Supreme Court has previously recognized, "the concept of deterrence and the need to balance individual justice with the needs of society - a balancing process that

- 8 -

is basic and fundamental to the general scheme of the criminal law - also have a place in the juvenile justice system. As a result of such balancing, some youths will be held accountable through proceedings in the adult criminal justice system for effective deterrence of future antisocial misconduct." *State v. Alexander*, 215 Neb. 478, 486, 339 N.W.2d 297, 301 (1983). The Court finds that retaining jurisdiction in the district court promotes the goals of specific deterrence (i.e., that individuals who commit crimes and are thereafter apprehended and punished will be deterred from engaging in future criminal activity) and general deterrence (i.e., that the general population will be deterred from offending when they are aware of others being apprehended and punished for their criminal activity).

Although the district court focused on deterrence in discussing the public safety factor, given Moore's history of violence, homicidal ideations, and aggressive behavior with other juveniles and adults, we agree with the district court that this factor supports a sound basis for retention. For the same reasons mentioned previously, we do not believe there is sufficient evidence that Moore's inability to take Abilify is determinative of whether he poses a threat to public safety. He is alleged to have committed a random act of violence upon someone he purposefully selected due to a perceived belief that the victim was weak and vulnerable. He expressed that he committed this act because he had been wanting to kill somebody for a long time. This was following two attempts to kill his stepbrother and one attempt to kill his stepsister. Additionally, it came after he expressed another plan to kill his stepbrother, a prior plan to kill a friend in Colorado that he had not gone through with, and a desire to "shoot up" his school. He also stated that when he was acting normally, he was performing "the art of disguise." Given this history, his ability to manipulate others, and his expressed desire to hurt and harm random people, we do not disagree that this factor supports a sound basis for retention in district court.

### 2. ABUSE OF DISCRETION

In addition to taking issue with the district court's conclusion as to certain factors under § 43-276(1), Moore also argues the district court abused its discretion by giving disproportionate amounts of weight to certain factors while failing to give adequate weight to others. Specifically, he asserts the district court gave a disproportionate amount of weight to the three factors discussed above, as well as § 43-276(1)(h), consideration of his ability to appreciate the nature and seriousness of his conduct, and failed to give enough weight to § 43-276(1)(d), his age and the ages and circumstances of any others involved, and § 43-276(1)(e), his previous history including whether he had been convicted of any previous offenses or adjudicated in juvenile court.

There is no mathematical computation or formula required in a court's consideration of the statutory criteria or factors. *State v. Esai P.*, 28 Neb. App. 226, 942 N.W.2d 416 (2020). There are no weighted factors, that is, no prescribed method by which more or less weight is assigned to each factor specified by statute. *Id.* It is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile. *Id.* This means that a trial court must balance a juvenile's amenability to complete rehabilitation by age 19 against the public's safety in the event that rehabilitation fails or requires more time than anticipated. *State v. Leroux*, 26 Neb. App. 76, 916 N.W.2d 903 (2018).

In our review, we find the district court's rationale for denial of the motion to transfer was fully supported by the record. As noted by the district court, eight factors weighed in favor of retaining the case in district court while six weighed in favor of transferring it to juvenile court. The factors that weighed in favor of retention were § 43-276(1)(a), (b), (c), (g), (h), (i), (j), and (k) while factors § 43-276(1)(d), (e), (f), (l), (m), and (n) weighed in favor of waiving jurisdiction to the juvenile court.

The evidence presented at the hearing revealed that Moore premeditatedly sought out a random victim to satisfy his urge to harm someone and inflict as much pain as possible upon that person. After not finding a suitable person at one store, unsuccessfully lying in wait in another store's bathroom, and scouting out a car wash employee as a potential victim, he came across K.P. After following K.P. to a more isolated area, Moore attacked him. Then upon losing his advantage and being restrained, Moore tricked K.P. into releasing him. Moore then reinitiated the attack and believed that he killed K.P. and reported that stabbing him "kind of felt nice." Afterward, Moore showed no remorse and expressed to law enforcement that he felt "nothing."

This incident occurred after Moore exhibited concerning behavior for multiple years. He routinely demonstrated poor and aggressive behavior in school and indicated that he liked to kill animals and set fires. He also threatened other students and medical providers telling the latter that he was "waiting for [his] time and then [was] going to hurt [them]." He went on to tell them, "[Honestly, I just want to kill someone right now. I'm trying to figure out how" and expressed that he "look[ed] forward to killing people."

Bruhn testified that after Moore's arrest, he remained at the highest level of risk for "general community violence." She additionally stated that Moore required treatment for his mental illness that involved an experienced therapist and that even with that treatment, he would need oversight to ensure that he participated in necessary services. Even when receiving this treatment and oversight at the LJDC, Moore still exhibited concerning behaviors. He threatened to kill staff and their families, told another juvenile resident that he was going to kill him, slapped one juvenile resident, punched another juvenile resident, and was physically aggressive with staff on multiple occasions. Additionally, at the time of the hearing, Moore continued to miss school and failed to cooperate with staff which led to 68 behavior violations over a 7-month period.

While Moore was only 15 years, 9 months old at the time of the hearing, had no criminal history, did not use a firearm in his attack, had no juvenile court orders issued against him, and was not a criminal street gang member, we agree with the district court that those factors are outweighed by the opposing factors that weigh in favor of retention. As such, we do not find the district court's decision was untenable or unreasonable. Accordingly, we find the district court did not abuse its discretion in denying Moore's motion to waive jurisdiction to the juvenile court.

VI. CONCLUSION

We find no abuse of discretion in the district court's denial of Moore's motion to waive jurisdiction to the juvenile court. Accordingly, the district court's order is affirmed.

AFFIRMED.