IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

STATE V. GILMER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

SALLIE E. GILMER, APPELLANT.

Filed July 23, 2024.    No. A-24-215.

Appeal from the District Court for Lancaster County: ANDREW R. JACOBSEN, Judge. Affirmed.

Kristi J. Egger, Lancaster County Public Defender, and Brittani E. Lewit for appellant.

Michael T. Hilgers, Attorney General, and Erin E. Tangeman for appellee.

MOORE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Sallie E. Gilmer (Gilmer) appeals the Lancaster County District Court's denial of her motion to transfer her case to the juvenile court. Because the district court's basis for retaining jurisdiction is supported by appropriate evidence, we cannot say the court abused its discretion in denying Gilmer's request, and we therefore affirm.

## II. BACKGROUND

Gilmer, age 15 at the time, stabbed her father, 70-year-old Jesse Gilmer, Jr., multiple times on October 3, 2022. Gilmer called her mother, Sherri Gilmer, to say she found her father covered in blood and that she thought he was dead; Gilmer's mother told her to call 911, which she did. Gilmer's father was found on a couch in the living room, sitting upright with his hands folded on his lap. His right leg was previously amputated beneath the thigh as a result of an automobile

- 1 -

accident that further damaged a leg injury Jesse sustained in the Vietnam War; in May 2022, he had fallen and broken his hip and was "wheelchair bound." Jesse had multiple stab wounds and was pronounced dead at the scene. Gilmer claimed that she had returned home from school and found her father "bloody on the couch."

Although Gilmer initially denied any involvement and gave various versions of what happened on the afternoon of October 3, 2022, Gilmer and her 16-year-old boyfriend, Isaac Honigschmidt, ultimately admitted to planning the murder the week prior. Before leaving school on October 3, they turned their phones to airplane mode and then shut them off to make it appear they were at school the entire time. Honigschmidt drove Gilmer home. After the stabbing, they drove back to school and turned their phones back on and Gilmer returned home to "discover" her father. Gilmer admitted to stabbing her father while Honigschmidt waited in his car. Gilmer gave Honigschmidt the knife used in the stabbing, and he disposed of it at a nearby grocery store where the police subsequently retrieved it. This court previously affirmed the Lancaster County District Court's denial of Honigschmidt's motion to transfer his case to the juvenile court. See *State v. Honigschmidt*, No. A-23-211, 2023 WL 4881248 (Neb. App. Aug. 1, 2023) (selected for posting to court website).

An information was filed in the district court on February 22, 2023, charging Gilmer with first degree murder pursuant to Neb. Rev. Stat. § 28-303 (Cum. Supp. 2022), a Class IA felony; and use of a deadly weapon to commit a felony pursuant to Neb. Rev. Stat. § 28-1205(1)(b) (Reissue 2016), a Class II felony. Pursuant to Neb. Rev. Stat. § 29-1816 (Cum. Supp. 2022), Gilmer filed a motion to transfer to the juvenile court on March 30, 2023; however, a hearing was not held until January 22, 2024.

1. TRANSFER HEARING EVIDENCE

(a) Chief Probation Officer's Testimony

Beverly Hoagland, chief probation officer for juvenile probation in Lancaster County, testified that she had been working in juvenile probation for 32 years. She had not met with Gilmer personally but had reviewed the intake information completed by another probation officer. Hoagland also reviewed the "petition," probable cause affidavit, and a portion of an evaluation by Dr. Colleen Conoley. To Hoagland's knowledge, Gilmer had not previously been adjudicated in juvenile court, nor been involved in any diversion programs offered through juvenile probation. Hoagland described the various disposition options available through the juvenile court for a youth, such as placement in the family home, a kinship home, foster care, group homes, and treatment group homes. She indicated that the "highest level of clinical" placement would be a psychiatric residential treatment facility and the "most restrictive commitment would be to the Youth Rehabilitation and Treatment Center [YRTC]," noting that the "facility in Hastings[, Nebraska,] typically houses females" and the one in Lincoln, Nebraska, "can house males and females." These facilities "tend to be more short-term, but they will typically house youth that have more significant behavioral or mental health needs." Both the psychiatric residential treatment facility and YRTC are secured facilities.

Hoagland also discussed the services available for a juvenile. These include outpatient therapy, intensive outpatient therapy, in-home multi systemic therapy that involves the youth and family, community youth coach, drug testing, art groups, a Boys Town home-based program, and

more. Based upon the "special circumstances" in the present case, Hoagland testified that a "high-risk supervision, highly skilled officer" would have responsibility over Gilmer. Hoagland stated that while juvenile probation has worked with youth who have caused serious harm or death to another person, they did not have a lot of such cases. To her knowledge, no "young girl under the age of 18" has been placed at the York Correctional Center; she was aware of a couple group homes that are "specific for girls," and the "YRTC facility in Hastings is specific for girls."

Hoagland reviewed portions of Dr. Conoley's evaluation, including the recommendation that Gilmer might be amenable to psychiatric residential treatment with medication management and cognitive behavioral therapy. Hoagland indicated that her office typically uses Emanuel and Boys Town, both in Omaha, Nebraska, for such treatment. Those places, however, are not required to take a youth. A youth could be denied based on "the youth's behavior being too assaultive, them not being a good fit in the milieu," and sometimes "their IQ could be a factor." If those facilities were not an option, juvenile probation could explore out-of-state options. And if they "otherwise exhausted everything, then the court would look to commit the youth to the YRTC."

Hoagland was not aware of any case involving an underlying conviction for murder resulting in a placement in a family home setting, kinship home, foster care, group home, or psychiatric residential treatment. Even juveniles charged with less serious crimes, such as "weapons offenses, [or] very assaultive behavior," have been denied placement under these options. Only the YRTC "has to take individuals," but Hoagland could not say for sure whether anyone convicted or adjudicated for murder had ever been placed there. She also acknowledged that in certain cases, juveniles are discharged from YRTC for noncompliance even though they have not completed their treatment. The youth would then "come back before the court to make a decision, either to terminate jurisdiction or develop another plan."

Hoagland was aware of one incident report during Gilmer's detention "pertaining to some self-harming" that had "something to do with maybe constructing a weapon out of some glasses." There could have been minor violations by Gilmer, but Hoagland is only notified of major violations.

(b) Transfer Hearing Evaluation

Dr. Conoley, a "private practice psychologist," testified that she "exclusively [did] evaluations," "primarily measurement interviews looking at collateral data." She was retained by Gilmer to complete an evaluation for the transfer hearing. Her 59-page report, dated November 22, 2023, was received as exhibit 6.

The evaluation involved interviews with Gilmer and Gilmer's mother, a review of interrogation videos, and the administration of a series of tests. Dr. Conoley also reviewed police records, statutes governing juvenile transfer cases, school records, and medical and mental health records. She met with Gilmer's mother twice in 2023, once in January and once in September. She met with Gilmer at the detention center eight times from February 6 to September 22, 2023, with each visit ranging from "90 minutes up to a little over three hours," for a total of "14, 15 hours." Dr. Conoley did not ask Gilmer about the allegations of the pending case against her because, "[e]thically, it's important to preserve her rights and to not interfere in any further adjudicative processes." When assessing the risk of "future dangerousness," Dr. Conoley made the assumption that Gilmer was guilty.

Dr. Conoley testified about the discovery of Gilmer having "B-cell lymphocytic leukemia" just before her second birthday and her subsequent chemotherapy. She was aware of literature that discusses how chemotherapy impacts "the white matter of the developing brain in these kids." She explained that white matter is the "connective pathways in the brain that allow the brain to communicate with itself within structures of the brain." "[W]e know that it impacts the development of vocabulary, which is found continuously to be low with [Gilmer]." She stated that "there are specific situations such as this leukemia protocol that can impact language development, memory, and things that we didn't see when we initially studied white matter." Another study "also demonstrated that these chemotherapy interventions only affect sleep, and this tends to be a delayed deficit." Dr. Conoley's evaluation indicated that the "emotional problems caused by poor sleep include aggression, impatience, impulsivity and inappropriateness, low-self-esteem, and mood swings." As applied to Gilmer, Dr. Conoley observed that Gilmer's "full scale IQ was within the low average range, but there was quite a bit of variability . . . [there are] going to be some areas where she performs much higher and some areas that she performs much lower in the typical school environment." Deficits were noted with Gilmer's vocabulary; "auditory working memory"; executive functioning, specifically "sustained attention and vigilance, with lesser findings in impulse control cognitively"; "social pragmatic communication," meaning that because of her hospitalization and treatment for leukemia when she was younger, she was "not around other children developing" and her "brain is not processing facial expressions, tone of voice, getting immediate feedback about what is appropriate versus what's not appropriate."

According to what Gilmer's mother, Sherri, reported to Dr. Conoley, Gilmer was "a daddy's girl or very attached to her father" but "her view of her father changed significantly early on" in her teen years. According to Sherri, Gilmer asked her to leave Jesse. Sherri reported that when fighting between Jesse and her would escalate, Jesse would take the "only family car for several days, would drain the bank account, would hold up in a hotel and hire a prostitute and smoke crack." Gilmer was made aware of this because "her mother had confided in her." Gilmer told Dr. Conoley that during such times, it was stressful because she and her mother were without a car, but "on the other hand, it was much more peaceful at home" as "[t]here wasn't any arguing." Gilmer "felt better, and mom wasn't as on edge." Gilmer saw her father as only caring about himself, and not caring about Gilmer or her mother.

Gilmer reported to Dr. Conoley that when her parents argued, objects would be thrown and broken, there was yelling, and that the "environment was intimidating and made her feel unsafe, and sometimes [Gilmer] would become involved in these, which . . . would escalate the situation further." According to Dr. Conoley, Gilmer reported that during these times, "she felt like she was losing her mind, that there was something wrong with her head. It was affecting her sleep, and it initiated her sneaking out at night and sleeping in other places."

Sherri reported to Dr. Conoley that Gilmer had made allegations of sexual abuse against her father and two boys who Gilmer met before Honigschmidt. In May 2023, Dr. Conoley asked Gilmer about these allegations, and Gilmer said that "those things did not happen." Gilmer told Dr. Conoley that "at the time she had written the letter to her mother, she believed that they had happened, but since she had gotten right on her meds, she knew that they had not happened." Dr. Conoley explained that one of Gilmer's diagnoses was "major depressive disorder, severe with psychotic features," and this includes "hallucinations . . . distortions of reality or believing things

- 4 -

to be true, even if evidence contradicts it." According to Dr. Conoley, Gilmer did not think that the allegations of sexual abuse from her father were "made-up."

Dr. Conoley also discussed her observations related to Honigschmidt's influence on Gilmer. Gilmer met Honigschmidt in January 2022. Sherri reported to her that "[Honigschmidt] was weird" in that "he tried to endear himself" to Gilmer's father by "buying him snacks at the convenience store, and . . . he seemed obsessed with knives and was bringing his knives over to show them." Sherri also said that Honigschmidt's mother discovered that Gilmer and Honigschmidt were having sex at their home, suggesting to Sherri that they were not properly supervised at Honigschmidt's home. Sherri also reported that Honigschmidt was "coming between" Gilmer and her friends and "causing problems" for Gilmer at school. Gilmer was having "panic attacks at school because of problems with her friends."

Dr. Conoley described Gilmer's relationship with Honigschmidt as "enmeshed, they were too involved with one another at almost a desperate level." Gilmer told Dr. Conoley that she knew her father "disliked" or "hated" Honigschmidt, and she was told by her mother that her father "wanted to kill him." Gilmer did not think that her mother had a problem with Honigschmidt, but she learned from her father that her mother did not like Honigschmidt. Jesse prohibited Gilmer from seeing Honigschmidt. However, Sherri aided Gilmer in deceiving Jesse regarding Honigschmidt picking up Gilmer in the morning to go to school. Gilmer and Sherri pretended that someone named "Lily" was picking up Gilmer when in reality it was Honigschmidt.

Sherri told Dr. Conoley that Honigschmidt's father had killed himself and at some point, Gilmer, without her parents' knowledge or consent, started participating in some of Honigschmidt's therapy sessions. The sessions included discussions about Honigschmidt's father's suicide and the "anger between [Honigschmidt] and his mother" or Honigschmidt's "inappropriate behavior with other girls prior to the session." After a few of these sessions Gilmer was "admitted into acute psychiatric hospitalization because she has suicidal ideation, and one of the reasons she gives is that it was upsetting to her that her boyfriend . . . [Honigschmidt], had been talking about suicide and had suicidal ideas himself." Gilmer started her own therapy in June 2022, with the "primary reason why she was being brought in per her mother in the note was there was cutting."

In August 2022, Jesse showed up in Honigschmidt's driveway "yelling at him, and . . . Honigschmidt . . . break[s] up with [Gilmer] and tell[s] her [he doesn't] think it's good for [him] to be here anymore with [her] dad still alive." Gilmer told Honigschmidt that she learned that once her father died, she would get $10,000. Honigschmidt asked Gilmer if she wanted to split it; Gilmer responded, "Alr, if mom lets me." Regarding Gilmer and Honigschmidt discussing harming or killing Gilmer's father, Dr. Conoley stated that "it started off as a fantasy or a joke in the beginning, and . . . it was discussed enough that they habituated to it or it was no longer taboo, and they . . . convinced each other that it was something that could be done, but they became used to the idea over time."

In meeting with Gilmer eight times between February 6 and September 22, 2023, Dr. Conoley observed that Gilmer had not "completely shifted her views towards Honigschmidt." Gilmer acknowledged that it was "bad for her to be involved" with Honigschmidt and that she was influenced by him, but at the same time, when asked "if she could go back and do things differently, her responses were that she should have introduced Honigschmidt to both of her

parents." "[T]here's still this fantasy that they could both be together, but it could be done the right way without anybody getting hurt."

Dr. Conoley scored Gilmer as a "low risk for dangerousness." It was her opinion that Gilmer would be amenable to treatment; that all the "disorders [Gilmer's] been identified to have . . . are all treatable." She believed that Gilmer was "still at a very high risk of suicide completion" and that a psychiatric residential treatment facility with consistent medication management combined with cognitive behavioral therapy would be the "most important starting place to make her safe for herself." It was Dr. Conoley's position that Gilmer was more of a risk to herself than to the community. Dr. Conoley's report concluded, "What is important to understand about this case is that a series of factors compounded over time created a context for this murder to have occurred. [Gilmer] tried in multiple ways to help herself. All methods failed her."

On cross-examination by the State, Dr. Conoley acknowledged that she had listened to Gilmer's call to 911 and that Gilmer did not exhibit much emotion during that call; "she did not show much affective expression" and that was "incongruent" with what was happening. Dr. Conoley confirmed that when she asked Gilmer in June 2023 what she would do "if she had a magic wand and could go back and change things," Gilmer's response was that she would "stop her parents fighting." She did not say she would go back and bring her father back to life. Dr. Conoley also confirmed that when she tested Gilmer in September 2023, the testing yielded a validity concern, and Gilmer "endorsed items that present an unfavorable impression or represent extremely bizarre and unlikely symptoms"; Dr. Conoley agreed that this result suggested an "element of exaggeration of complaints and problems." Nevertheless, Dr. Conoley maintained that there was sufficient time to treat Gilmer before she turned 19. It was her position that the "psychiatric disorders . . . the major depressive disorder, . . . could be brought to functional level." She stated her report is supposed to

> provide all those factors for the treating therapist to be able to come in and do cognitive behavioral therapy and teach her skills with the correct medication management to get her to the point where she has enough adaptive skills, coping skills, and her depression is significantly improved and that she understands her trauma and can deal with it and compartmentalize it in that amount of time. Yes, that's doable.

The State asked Dr. Conoley if her assessment of Gilmer being a "low risk for dangerousness" included consideration of her self-harm, including "punching herself in the face to the point of having bloody noses," "cutting," and an incident in detention when she constructed a homemade weapon out of glasses. According to Dr. Conoley, "self-harm is not listed as one of the violent or aggressive tendencies." The State also questioned Dr. Conoley's finding that Gilmer was not "manipulative." Dr. Conoley responded that the definition used for that trait was a "youth who convinces others or persuades others to engage in criminal or devious behavior on their behalf." She acknowledged reading police reports and text exchanges between Gilmer and Honigschmidt and agreed that the two had "concocted a cover story for them to get away with committing this murder." Dr. Conoley acknowledged that the pair "cut[] off their phones," concocted a story about staying after school, used nitrate gloves in committing the act, and Gilmer gave the knife to Honigschmidt to dispose of in a trash can at a nearby grocery store. Dr. Conoley disagreed that this constituted Gilmer being manipulative; rather, "[t]hat's scored under planned

- 6 -

. . . it fits under the coding of leadership role, that it was primarily her idea . . . [a]nd so that's where those get scored. I can't double dip." When asked if a person "can't be manipulative as well as a leader," Dr. Conoley responded, "You can be, but they have specific definitions, and I have to follow those definitions." To have scored Gilmer as "manipulative," Gilmer "would have had to have convinced Honigschmidt to have killed her father instead of her doing it."

The State also asked Dr. Conoley whether manipulation would include the "fact that there was discussion of a life insurance policy of $10,000" that Gilmer "might receive upon the death of her father and was willing to split it" with Honigschmidt. Dr. Conoley responded, "According to the test, it does not." Gilmer calling 911 and making up a story about how her father was killed also did not constitute manipulation under the test. Dr. Conoley did agree that Gilmer may require continued mental health support beyond the age of 19.

### 2. DISTRICT COURT'S ORDER DENYING TRANSFER

Concluding that there was a sound basis for retaining jurisdiction, the district court entered an order denying transfer on March 12, 2024. The details of the court's consideration of the transfer factors contained in Neb. Rev. Stat. § 43-276 (Cum. Supp. 2022) are set forth below in our analysis.

## III. ASSIGNMENT OF ERROR

Gilmer claims the district court abused its discretion by denying her motion to transfer to the juvenile court.

## IV. STANDARD OF REVIEW

A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

## V. ANALYSIS

### 1. JURISDICTION

When an alleged offense is one over which both the juvenile court and the criminal court can exercise jurisdiction, a party can move to transfer the matter. Section 29-1816(3)(c) provides that "[a]n order granting or denying transfer of [a] case from county or district court to juvenile court shall be considered a final order for the purposes of appeal. Upon entry of an order, any party may appeal to the Court of Appeals within ten days." The district court entered an order denying Gilmer's motion to transfer on March 12, 2024. Gilmer appealed on March 18; her appeal is timely.

### 2. LEGAL FRAMEWORK

Neb. Rev. Stat. § 43-246.01(3) (Reissue 2016) grants concurrent jurisdiction to the juvenile court and the county or district courts over juvenile offenders who (1) are 11 years of age or older and commit a traffic offense that is not a felony or (2) are 14 years of age or older and commit a Class I, IA, IB, IC, ID, II, or IIA felony. Actions against such juveniles may be initiated either in juvenile court or in the county or district court. In the present case, all the allegations against

Gilmer put her within the second category of juvenile offenders. The State elected to file charges against Gilmer in the district court.

When Gilmer moved to transfer her case to juvenile court, the district court conducted a hearing pursuant to § 29-1816(3)(a), which subsection requires consideration of the following factors set forth in § 43-276(1):

(a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim or juvenile agree to participate in restorative justice; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

The customary rules of evidence shall not be followed at such hearing and, "[a]fter considering all the evidence and reasons presented by both parties, the case shall be transferred to juvenile court unless a sound basis exists for retaining the case in county court or district court." See § 29-1816(3)(a). "[F]actors that are considered 'neutral' or 'not applicable' are equivalent to factors that favor transfer because § 43-276 starts with the presumption that the case should be transferred." *State v. Aldana Cardenas*, 314 Neb. 544, 561, 990 N.W.2d 915, 928 (2023). The classification of certain factors as "neutral," "not applicable," or "weighing in favor of transfer" are better described as factors that do not support a sound basis for retention. See *id*.

As the Nebraska Supreme Court has explained, in conducting a hearing on a motion to transfer a pending criminal case to juvenile court, "[i]t is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile." *Id*. "[I]n order to retain the proceedings, the court need not resolve every statutory factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor." *Id*. "[T]he burden of proving a sound basis for retention lies with the State." *Id*. at 557, 990 N.W.2d at 926.

When a district court's basis for retaining jurisdiction over a juvenile is supported by appropriate evidence, it cannot be said that the court abused its discretion in refusing to transfer the case to juvenile court. *State v. Hunt, supra*.

- 8 -

### 3. STATUTORY FACTORS AS APPLIED TO GILMER

#### (a) Amenability to Treatment, § 43-276(1)(a)

Gilmer argues that the district court "abused its discretion in concluding that this factor is neutral." Brief for appellant at 17. However, the district court did not say that this factor was neutral. But neither did it specifically state that this factor favored retention. Read in its entirety, the court's discussion of this factor led to its ultimate conclusion that Gilmer would need supervision and treatment beyond age 19, a recurring concern throughout the court's order. Such a conclusion implicitly favors retention.

After summarizing testimony from Hoagland and Dr. Conoley pertinent to this issue, the district court pointed out that Gilmer "had just turned 17 a month before these proceedings," she "has a history of trauma and suicidal ideation," and that it was "clear" she was a "disturbed young woman." The court described the placement options and limitations under juvenile probation. And it referred to Hoagland's understanding that if a "juvenile under the age of 18 is sentenced to the Department of Corrections," the juvenile would be "separated from the adult population until the age of 18." The court also acknowledged Dr. Conoley's opinion that Gilmer was a low risk overall for dangerousness, as well as her recommendation for placement at a psychiatric residential treatment facility. But the court also pointed out Dr. Conoley's acknowledgment that Gilmer "may require treatment and support beyond age 19." It added,

> Clearly she is in need of psychological therapy and services that may be of long duration and would require both inpatient and closely supervised outpatient services. The court finds that rehabilitative treatment would be equally available in both a juvenile and adult setting. The potential length would be more limited in juvenile court.

We agree with the State that "it is clear from the context of the district court's order that it believed Gilmer would need supervision and treatment extending beyond the juvenile court's jurisdiction," thus indicating that this factor weighed in favor of retention. Brief for appellee at 10. Even Dr. Conoley acknowledged that Gilmer may need treatment and support beyond age 19. Such supervision and support could not be required for Gilmer after her 19th birthday if the case was transferred to juvenile court. While it is certainly the hope that Gilmer will respond favorably to treatment as recommended by medical professionals, we cannot say it was an abuse of discretion for the district court to conclude that Gilmer will require mandatory rehabilitation efforts beyond her 19th birthday.

#### (b) Violence, § 43-276(1)(b)

The district court pointed out that Gilmer "is alleged to have planned to kill her father," and that she got out of her boyfriend's vehicle while he waited, "went to the family apartment and stabbed her father numerous times causing his death." It added that there was evidence that the offense was "planned, premeditated, aggressive and violent," thus making this factor favor retention. Gilmer contends the court "gave too much weight to this factor." Brief for appellant at 18. She argues that the "violence of the crime is only one among at least fifteen total factors" and the statutory language does not suggest that the "factor of violence has greater importance than any of the others." *Id*. She also argues that "premeditation is irrelevant to this factor." *Id*. at 19.

The State counters that the "victim was stabbed numerous times while also suffering blunt force trauma, all while he was defenseless and posed no physical threat." Brief for appellee at 10. The State contends that the "brutal and excessive nature of the injuries to the victim" supports the district court's conclusion that this factor favored retention. *Id*. We agree. The autopsy report indicates there were six stab wounds and a laceration on the front of Jesse's head. One stab wound went through his rib cage and hit an artery, causing him to bleed out internally over the course of a few minutes. Gilmer admitted to stabbing her father and, along with her boyfriend, planned how to do it and how to avoid being caught. While it is true that violence is only one of many factors to be considered, the violent nature of this crime supports retention.

(c) Motivation for Commission of Offense, § 43-276(1)(c)

The district court found that the motivation for the offense was based on Gilmer's "attempt to eliminate the stress, depression, and anxiety caused by her [father's] constant fighting with her mother, his mental abuse, his tendency to commit acts placing the family in debt and her desire to continue her relationship with . . . Honigschmidt." The court did not indicate whether it determined this factor favored retention or transfer.

Gilmer argues that she "did not have an evil purpose such as revenge or hatred, but rather was entirely overcome by her relative inability to control the circumstances of her life." Brief for appellant at 19. She contends she was subjected to "intensely negative emotional reactions because of the actions of her parents, which were completely outside her control." *Id*. at 20. She also points to Dr. Conoley's testimony that Gilmer was "very amenable to treatment because the disorders she faces . . . can be rectified through medication or by taking her out of the harmful environment." *Id*.

The State responds that "Gilmer had numerous outlets or people she could have turned to for help: her multiple different therapists/medical providers, her mom, teachers or school officials, and any other trusted adult in her life." Brief for appellee at 11. "[T]his factor weighs in favor of retention because the motivations set forth by the district court could have been mitigated if Gilmer had continued to reach out for help rather than murdering her father." *Id*.

Whatever motivated Gilmer to take her father's life, it cannot be justified, unless she was acting in self-defense, which she does not claim. Even if this factor could be construed as favoring transfer because of the absence of any statement or implication by the district court otherwise, it is but one consideration to balance against those that support retention.

(d) Age and Circumstances, § 43-276(1)(d)

This factor considers the age of the juvenile and the ages and circumstances of any others involved in the offense. The district court found that at the time of her arrest, Gilmer was "15 years and 9 months old," and her "co-defendant" Honigschmidt was "16 years old." It also pointed out that the "homicide was planned between the two," with both making "plans and efforts to conceal the crime." Again, the court did not indicate whether these facts supported retention or transfer, although the implication is that the premeditation and concealment aspects support retention.

Gilmer argues that the district court "unreasonably fails to consider the evidence introduced at the hearing . . . that [Gilmer's] boyfriend had gained a coercive level of control over her." Brief for appellant at 20. She contends that her "emotional connection with the co-defendant undermined her capacity to make rational decisions in her self-interest" and that "[i]ntense peer pressure is a

unique issue for juvenile offenders, and for that reason this evidence . . . favors . . . transfer to juvenile court." *Id.* at 21. The State argues that Gilmer "called all of the shots regarding timing" and based on the "severity of the offense and the circumstances involved in planning it," this factor weighs in favor of retention. Brief for appellee at 11.

Gilmer's young age and her "enmeshed" relationship with Honigschmidt that Dr. Conoley described as being "too involved with one another at almost a desperate level," may support transfer to juvenile court. Even so, it must be weighed against other factors that support retention.

### (e) Juvenile's Previous History, § 43-276(1)(e)

The district court found that this factor favored transfer to the juvenile court since Gilmer had "no previous criminal violations or adjudications in juvenile court." Gilmer agrees but suggests that the court "failed to provide proper weight to this factor in making its final determination on transfer." Brief for appellant at 21.

### (f) Juvenile's Best Interests, § 43-276(1)(f)

The district court acknowledged that "[i]t may very well be in [Gilmer's] best interest to be transferred to the juvenile court as opposed to being a convicted felon or being exposed to the possibility of serving a lengthy sentence of incarceration." However, when considering Gilmer's age, the court concluded that this factor favored retention because "a longer period of supervision or services would prove beneficial to [Gilmer]."

Gilmer disagrees, arguing that the district court had "no reasonable basis to conclude that a longer period of supervision [was] necessary." Brief for appellant at 22. She points to Hoagland's testimony that a youth can make significant progress within 2 years and that probation could arrange for psychiatric residential treatment if ordered. And if Gilmer needed more treatment after reaching the age of majority, "that would be available for [Gilmer] in the community." *Id.* She also suggests that the court failed to consider the negative impact incarceration in an adult prison would have on Gilmer. She "would likely be separated from other prisoners," which would cause a "long period of isolation from all peers and greatly exacerbate [Gilmer's] trauma and depression." *Id.* She states that the court abused its discretion by "unreasonably reaching a conclusion against the recommendation of an expert mental health professional" and without considering "the unique risks to [Gilmer's] safety that incarceration as an adult would pose." *Id.* at 23.

The State responds that the evidence suggested that Gilmer might not be accepted into a psychiatric residential treatment facility "due to the severity of her charges." Brief for appellee at 12. The district court's conclusion "that Gilmer's best interests would be best executed through the retention of jurisdiction is understandable, given concerns about securing placement and the need for supervision beyond the juvenile court's jurisdiction." *Id.*

Juvenile court jurisdiction will always be in a juvenile's best interests over adult criminal court for the reasons identified by the district court. However, it is also appropriate to consider what treatments and what duration may be in the juvenile's best interests to achieve full rehabilitation in order to properly and safely function when no longer being held accountable by the legal system. Therefore, the district court did not abuse its discretion in finding that secure placement and supervision beyond Gilmer's 19th birthday would be in her best interests, thus resulting in this factor favoring retention.

The district court found this factor also weighed in favor of retention, noting that the "current charges are the most serious and greatly concern public safety." The court acknowledged Dr. Conoley's assessment that placed Gilmer in the range of low risk for dangerousness, but "this does not change the fact that [Gilmer] and her co-defendant spent a considerable amount of time planning to kill her father. She stabbed her father no less than six times causing death." They "took considerable steps to avoid detection including repeatedly lying to law enforcement about the circumstances" of their involvement. The court noted that the Nebraska Supreme Court has previously recognized that "the concept of deterrence and the need to balance individual justice with the needs of society" will result in some youths being "held accountable through proceedings in the adult criminal justice system for effective deterrence of [future] antisocial misconduct." *State v. Alexander*, 215 Neb. 478, 486, 339 N.W.2d 297, 301 (1983) (internal quotations omitted).

Gilmer claims that she "poses little to no risk to public safety." Brief for appellant at 23. She points out that she has "no history of violence outside of this charge, and that [she] has demonstrated remorse and empathy." *Id*. She contends that "[s]imply because some youths may require the adult criminal justice system does not mean [she] does." *Id*. at 23-24.

It may be true that Gilmer will pose no threat to public safety in the future, but the fact that she was able to stab her own father despite at one time being "a daddy's girl or very attached to her father," is very concerning at the present time. If Gilmer is not allowed enough time to mature and receive appropriate treatment and supervision, the risk is too great that she may again become so overwhelmed or out of control that she could again engage in such violence. The district court did not abuse its discretion by finding this factor favored retention.

(h) Ability to Appreciate Nature of Conduct, § 43-276(1)(h)

The district court found that Gilmer "does appear to appreciate the nature and seriousness of her conduct" and that this factor favored retention. Her "attempts to avoid detection both before and after the crime, combined with the 911 call and statements to law enforcement, show that she knew right from wrong and an appreciation for the potential consequences."

Gilmer argues that the district court abused its discretion "by unreasonably conflating actions taken to avoid detection with moral knowledge." Brief for appellant at 24. Gilmer contends that the evidence "strongly suggests that [her] ability to understand the moral character of her actions was deeply impaired." *Id*. She argues that her "mental state was being influenced by a confluence of various factors including: hopelessness from failed attempts to escape the stress of her parents' fighting, multiple prior suicide attempts, fear of losing her relationship with her boyfriend, fear of her father whom she believed was cruel and unfair, isolation from family members, inability to sleep, disordered thinking from disruptions to medication, and psychosis arising from her major depressive disorder." *Id*. Citing to *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), she contends that children are generally understood to have diminished capacity with respect to appreciating the seriousness of their actions and that the court failed to consider Gilmer's youth in making its determination.

There is nothing in the record to indicate that Gilmer did not understand the seriousness of her actions. While all the circumstances that Gilmer claims impacted her decision to kill her father may warrant consideration under other transfer factors or in determining how to help her

rehabilitate, they do not change the fact that she was able to appreciate the nature of her conduct at the time of the crime and the week preceding it when she discussed and planned it with Honigschmidt.

(i) Length of Detention Needed, § 43-276(1)(i)

This factor considers whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond the juvenile's minority and, if so, the available alternatives best suited to this purpose. In finding this factor weighed in favor of retention, the district court pointed out that Gilmer had less than "24 months remaining under juvenile court jurisdiction." It found this to be "significant . . . as it is clear that the juvenile court would have a limited amount of time to work with [Gilmer], if or when there was an adjudication." It pointed out that even if it were to transfer the case to the juvenile court, "that court would not immediately be able to make any dispositional orders to correct the issues leading to the charged conduct." There would have to be an adjudication and Gilmer would have a right to a trial to contest the allegation. "This would lead to additional time for a disposition to occur" and would leave less time under the juvenile court's jurisdiction. It weighed Gilmer's amenability to complete rehabilitation by age 19 against the public's safety in the event her rehabilitation failed or required more time than anticipated.

Gilmer points out that she "has been and remains in custody since her arrest at 15 years old." Brief for appellant at 25. "This would essentially give the system nearly four years to work with [her] and her treatment and rehabilitation." *Id*. "This, in combination with her low risk to public safety and high level treatment amenability leads to the conclusion that she would not need to be supervised beyond her minority." *Id*.

The State counters by pointing to Gilmer's "prior mental health issues, participation in planning and carrying out the murder of the victim, numerous attempts to conceal that conduct, the rationale for the murder, current age and time remaining as a minor, current behavioral trajectory, and rehabilitative needs," and noting that these considerations all support Gilmer requiring "ongoing treatment past her 19th birthday." Brief for appellee at 13.

We agree that the time left for rehabilitation is a significant consideration in this case. As this court has previously stated, a "trial court must balance a juvenile's amenability to complete rehabilitation by age 19 against the public's safety in the event that rehabilitation fails or requires more time than anticipated." *State v. Leroux*, 26 Neb. App. 76, 118, 916 N.W.2d 903, 929 (2018). "The trial court's decision carries the consequence that if the decision is wrongly made, we have either missed an opportunity to rehabilitate a juvenile outside the negative influences of adult incarceration or failed to adequately incarcerate a potentially dangerous juvenile who will go on to commit further violent crimes." *Id*.

In June 2023, when Gilmer was asked "if she had a magic wand and could go back and change things, what would she do," her response was that she would "stop her parents' fighting" and would have "introduced her parents to [H]onigschmidt], thinking that this would have caused her father to like him." She did not say she would go back and bring her father back to life. Even though Gilmer acknowledged that it was "bad for her to be involved" with Honigschmidt and that she was influenced by him, her focus remained on maintaining a relationship with him. In fact, Dr. Conoley's evaluation indicates that since Gilmer's detainment, she has received 20 infractions for

communicating with Honigschmidt. Further, in Dr. Conoley's eighth and final meeting with Gilmer in September 2023, Gilmer's testing yielded a validity concern, which Dr. Conoley agreed suggested an "element of exaggeration of complaints and problems." Given the apparent lack of rehabilitation progress while Gilmer has been detained, we cannot say the district court abused its discretion by concluding that Gilmer's rehabilitation may require detention beyond her minority.

### (j) Restorative Justice, § 43-276(1)(j)

This factor considers whether the victim or the juvenile agree to participate in restorative justice. The district court acknowledged that Gilmer's mother was open to participating in the restorative justice process and that her therapist and Gilmer's therapist agreed they could benefit from the process. This factor therefore favors transfer.

### (k) Juvenile Pretrial Diversion Availability, § 43-276(1)(k)

This factor considers whether there is a juvenile pretrial diversion program established pursuant to Neb. Rev. Stat. §§ 43-260.02 to 43-260.07 (Reissue 2016 and Cum. Supp. 2022). These statutes allow a county attorney to establish a juvenile pretrial diversion program with the agreement of its county board, or a city attorney with the agreement of the city's governing body. See § 43-260.02.

The district court found that this factor favored retention because although juvenile diversion services existed, Gilmer was not eligible because of the charges. Gilmer acknowledges that there was no evidence received on this factor and she "raises no issue" as to the court's decision on this factor. Brief for appellant at 26.

### (l) Use or Possession of Firearm, § 43-276(1)(l)

This factor considers whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm. The district court found that this factor weighed in favor of transfer because there was no such evidence.

### (m) Not Amenable to Rehabilitative Services, § 43-276(1)(m)

This factor considers whether a juvenile court has issued an order under § 43-2,106.03 which indicates the juvenile is not amenable to rehabilitative services that can be provided under the juvenile code. The district court found this factor weighed in favor of transfer because there had been no previous juvenile court order making such a finding.

### (n) Criminal Street Gang Member, § 43-276(1)(n)

The district court found that this factor weighed in favor of transfer because Gilmer was not a member of a criminal street gang.

### (o) Other Matters, § 43-276(1)(o)

The district court found no other considerations to be applicable. Gilmer does not contest this determination.

## 4. NO ABUSE OF DISCRETION

When a district court's basis for retaining jurisdiction over a juvenile is supported by appropriate evidence, it cannot be said that the court abused its discretion in refusing to transfer the case to juvenile court. *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018). Further, "in order to retain the proceedings, the court need not resolve every statutory factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor." *State v. Aldana Cardenas*, 314 Neb. 544, 561, 990 N.W.2d 915, 928 (2023).

The district court specifically or implicitly found the following factors favored retention: (a) amenability to treatment (needing treatment beyond age 19), (b) violence, (f) best interests, (g) public safety, (h) ability to appreciate nature of conduct, (i) length of detention needed, and (k) ineligible for pretrial diversion based on the charges. The court found or was silent as to the following factors not supporting retention: (c) motivation, (d) age and circumstances (which may have implicitly been found to favor retention), (e) juvenile's previous history, (j) restorative justice, (l) no use or possession of a firearm, (m) no previous juvenile court finding that Gilmer would not be amenable to juvenile court rehabilitative services, and (n) Gilmer was not a street gang member. We exclude (o) because no other matters were considered. By count alone, there are an equal number of factors supporting retention as there are not supporting it. But as set forth above, there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor in order for a court to retain jurisdiction. See *State v. Cardenas, supra*. Notably, the factors favoring retention relate to the seriousness of the offense and the time needed to rehabilitate Gilmer to the point where she is not a danger to the public. The factors that do not support retention are her age and lack of criminal history.

Gilmer makes many valid arguments in her brief on appeal. So does the State. Gilmer's cognitive behavioral functioning may very well have been impaired by chemotherapy and hospitalizations as a young child and may have been further affected by her perception of a difficult home life that was exacerbated by her relationship with Honigschmidt. However, the horrific step she took to eliminate interference with that relationship indicates profound psychological issues that make the risk too great that the limited time remaining under a juvenile court's jurisdiction would be inadequate to complete rehabilitation, thus resulting in Gilmer being released from medical and legal supervision prematurely.

The district court's analysis of the statutory factors as applied to Gilmer is supported by appropriate evidence, and we therefore cannot say that the court abused its discretion in refusing to transfer the case to the juvenile court.

## VI. CONCLUSION

Finding no abuse of discretion by the district court in its decision to retain jurisdiction over Gilmer, we affirm the court's order denying Gilmer's motion to transfer the proceedings to the juvenile court.

AFFIRMED.